JAMES M. WAGSTAFFE (95535)
MICHAEL VON LOEWENFELDT (178665)
MICHAEL NG (237915)
**KERR & WAGSTAFFE LLP**
101 Mission Street, 18th Floor
San Francisco, CA 94105
Tel.: 415-371-8500
Fax: 415-371-0500
Email: wagstaffe@kerrwagstaffe.com
Email: mvl@kerrwagstaffe.com
Email: mng@kerrwagstaffe.com

DAVID M. GIVEN (142375)
NICHOLAS A. CARLIN (112532)
**PHILLIPS, ERLEWINE & GIVEN LLP**
50 California Street, 32nd Floor
San Francisco, CA 94111
Tel: 415-398-0900
Fax: 415-398-0911
Email: dmg@phillaw.com
Email: nac@phillaw.com

Interim Co-Lead Counsel for Plaintiffs

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

MARC OPPERMAN, et al.,

Plaintiffs

v.

PATH, INC., et al.,

Defendants.

Case No. 13-cv-00453-JST

**CLASS ACTION**

**OPPERMAN PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE, INC.'S MOTION TO DISMISS SECOND CONSOLIDATED AMENDED COMPLAINT**

*Hernandez v. Path, Inc.*, No. 12-cv-1515-JST
*Pirozzi v. Apple, Inc.*, No. 12-cv-1529-JST
(collectively, the "Related Actions")

Date: December 2, 2014
Time: 2:00 p.m.
Courtroom: 9, 19th Floor

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. PLAINTIFFS DID NOT CONTRADICT THEIR PRIOR PLEADINGS OR CREATE INCONSISTENCIES BY STREAMLINING THE ALLEGATIONS ..... 2

III. ARGUMENT ..... 3

A. Plaintiffs Have Properly Pled Their Affirmative Misrepresentation Claims ..... 3

1. Plaintiffs' Claims Under Tobacco II Do Not Require Identification Of The Specific Representations Each Plaintiff Relied On ..... 3

2. Plaintiffs Have Adequately Pled Their Tobacco II Claims ..... 3

a) Each plaintiff saw or heard the advertising campaign and pled how he or she was exposed to it ..... 4

b) Each Plaintiff has alleged when he or she purchased the iDevices 6

c) The campaign was sufficiently lengthy and widespread under the circumstances to make it unrealistic to require each plaintiff to plead the specific representation he or she saw ..... 6

d) Plaintiffs have sufficiently described the campaign and provided examples ..... 8

e) Apple's representations consistently misdescribe iDevice privacy features and misrepresent the security of data on iDevices ..... 10

B. Plaintiffs Have Properly Pled Their Omission Claim ..... 10

1. Plaintiffs Sufficiently Allege The Flaw Existed During The Warranty Period ..... 10

2. Plaintiffs Sufficiently Pled Active Concealment ..... 12

3. Apple Had, And Still Has, Exclusive Knowledge Of Many Material Facts ..... 14

4. Apple's Partial Disclosures Triggered An Obligation Of Full Disclosure ..... 14

C. Plaintiffs Have Properly Pled Their Invasion Of Privacy And Conversion Claims Against Apple ..... 15

1. Plaintiffs' Aiding And Abetting Pleadings Satisfy Rule 8 ..... 15

2. Apple Has Co-Venturer Liability For Each App ..... 16

3. Plaintiffs Have Properly Pled Their Privacy And Conversion Claim ..... 17

D. Apple's Injunctive Relief Argument Is Baseless ........ 18

E. Apple Cannot Relitigate Its Already-Rejected CDA Defense By Mischaracterizing Plaintiffs' Claims ........ 21

1. The CDA Provides A Limited Affirmative Defense, Not Blanket Immunity ........ 21

2. The Claims Alleged Against Apple Do Not Trigger A CDA Defense ........ 22

3. Apple's Prior Public Promises To Protect iDevice Owners From Privacy-Invading Apps Waived Any CDA Defense ........ 27

IV. CONCLUSION ........ 28



# TABLE OF AUTHORITIES

**Pages**

***Cases***

Apodaca v. Whirlpool Corp., 2013 WL 6477821 (C.D. Cal. Nov. 8, 2013) ........ 10

Apple iPod iTunes Antitrust Litigation, 05-cv-00037-JW (N.D. Cal. Jan. 18, 2011) ........ 1

Apple, Inc. v. Devine, 10-cv-03563-EJD (Aug. 13, 2010) ........ 2, 17, 18

Apple, Inc. v. Samsung Electronics Co., 11-cv-01846-LHK (N.D. Cal. Aug. 7, 2012) ........ 20

Apple, Inc. v. Samsung Electronics Co., Ltd., 12-cv-00630-LHK (N.D. Cal. July 1, 2012) ........ 20

Barnes v. Yahoo!, 570 F.3d 1095 (9th Cir. 2009) ........ 27

Barnes v. Yahoo!, Inc., 570 F.3d 1096 (9th Cir. 2009) ........ 22, 28

Bates v. United Parcel Serv., Inc., 511 F.3d 974 (9th Cir. 2007) ........ 19

Batzel v. Smith, 333 F.3d 1018 (9th Cir. 2003) ........ 23

Carafano v. Metrosplash, 339 F.3d 1119 (9th Cir. 2003) ........ 21

Chang v. Rockridge Manor Condominium, 2008 WL 413741 (N.D. Cal. Feb. 13, 2008) ........ 26

City of Los Angeles v. Lyons, 461 U.S. 95 (1983) ........ 19

Collins v. eMachines, Inc., 202 Cal. App. 4th 249 (2011) ........ 14

Comm. On Children's Television, Inc. v. Gen. Foods Corp., 35 Cal. 3d 197 (1983) ........ 7

Delalla v. Hanover, Ins., 2010 WL 3259816 (E.D. Pa. Aug. 17, 2010) ........ 26

Doctor's Assocs. Inc. v. QIP Holders, LLP, 06-cv-1710 (D. Conn. Apr. 19, 2007) ........ 22, 24

Donohue v. Apple, Inc., 871 F. Supp. 2d 913 (N.D. Cal. 2012) ........ 10

Elias v. Hewlett-Packard Co.,
950 F. Supp. 2d 1123 (N.D. Cal. 2013) .......... 10

Fair Housing Council of San Fernando Valley v. Roommates.com,
521 F.3d 1157 (9th Cir. 2010) .......... 21, 23, 24

Falk v. General Motors Corp.,
496 F. Supp. 2d 1088 (N.D. Cal. 2007) .......... 14

Fraley v. Facebook, Inc.,
830 F. Supp. 2d 785 (N.D. Cal. 2011) .......... 23

Haskins v. Symantec Corp.,
2014 WL 2450996 (N.D. Cal. June 2, 2014) .......... 3

Holtz v. United Plumbing and Heating Co.,
49 Cal. 2d 501 (1957) .......... 16

In re Jamster Mktg. Litig.,
2009 WL 1456632 (S.D. Cal. May 22, 2009) .......... 8

In re Tobacco II,
46 Cal.4th 298 (2009) .......... 5, 8, 13

Kaljian v. Menezes,
36 Cal. App. 4th 573 (1995) .......... 16

Lima v. Gateway, Inc.,
710 F. Supp. 2d 1000 (C.D. Cal. 2010) .......... 11, 14

Makaeff v. Trump University, LLC,
2014 WL 688164 (S.D. Cal. Feb. 21, 2014) .......... 6, 7

Morales v. Unilever United States, Inc.,
2014 WL 1389613 (E.D. Cal. April 9, 2014) .......... 5

Morgan v. AT&T Wireless Services, Inc.,
177 Cal. App. 4th 1235 (2009) .......... 4, 7

New Hampshire v. Maine,
532 U.S. 742 (2001) .......... 17, 20

O'Shea v. Littleton,
414 U.S. 488 (1974) .......... 19

Pirozzi v. Apple,
913 F. Supp. 2d 840 (N.D. Cal. 2012) .......... 26

Rahman v. Mott's LLP,
2014 WL 325241 (N.D. Cal. Jan. 29, 2014) .......... 19

Rissetto v. Plumbers and Steamfitters Local 343,
94 F.3d 597 (9th Cir. 1996) .......... 17, 18

Russell v. Rolfs,
893 F.2d 1033 (9th Cir. 1990) .......... 17

Stratton Oakmont, Inc. v. Prodigy Services Co., 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ........ 21

Swift v. Zynga Game Network, Inc., 2010 WL 4569889 (N.D. Cal. Nov. 3, 2010) ........ 23, 24

Whiteley v. Philip Morris, Inc., 117 Cal. App. 4th 635 (2004) ........ 8

Yordy v. Plimus, Inc., 2012 WL 2196128 (N.D. Cal. June 14, 2012) ........ 8

***Statutes***

47 U.S.C. § 230(c) ........ 21, 22

Bus. & Prof. Code § 17500 ........ 8

Cal. Commercial Code § 2316(1) ........ 11

***Other Authorities***

David Carr, The Magic in Apple's Products: The Heart, N.Y. Times, Sept. 14, 2014 ........ 7

John Martello, How Apple Does Controlled Leaks, The Mac Observer, Jan. 5, 2010 ........ 8

Mark Gurman, Seeing Through the Illusion: Understanding Apple's Mastery of the Media, 9 to 5 Mac, Aug. 29, 2014 ........ 8

*The Charlie Rose Show: Interview of Apple CEO Tim Cook* at 33 minutes (PBS television broadcast Sept. 12, 2014), http://www.charlierose.com/watch/60444569 ........ 1

***Rules***

Fed. R. Civ. P. 8(a)(2) ........ 15

Fed. R. Civ. P. 9(b) ........ 16

## I. INTRODUCTION

"Plaintiffs' case is rather simple. Plaintiffs allege that Apple sold them devices that make it possible for third parties to access and copy Plaintiffs' address books without their knowledge." (ECF No. 471 (hereinafter "Order") at 11-19.) In addition to suing those third parties (the "App Defendants"), Plaintiffs sued Apple for (1) misrepresenting, both directly and by omission, the security and privacy features and protections provided by Apple's iDevices, and (2) joint liability for aiding and abetting the theft of Plaintiffs' address books by the App Defendants.

With respect to the former, Plaintiffs' Second Consolidated Amended Complaint (ECF No. 478 (hereinafter "SCAC")) carefully pleads each element of these claims as required by the Court's Order. The Court should reject Apple's renewed attack on these claims and allow Plaintiffs' case and discovery to move forward.

With respect to the latter, Plaintiffs' allegations concerning Apple's enabling and teaching App Defendants to obtain supposedly secure address book data without requesting permission (despite its publicly-stated policy to the contrary), and its other involvement in the development, promotion, marketing, sales, licensing and delivery of the offending Apps, satisfy Plaintiffs' Rule 8 burden and substantiates that Apple is a jointly liable co-venturer with respect to each App in suit. Apple's motion wholly disregards Apple's role in creating each App, its publicly-admitted, pre-release familiarity with each of the Apps, its agency and partner relationships[1] with the App Defendants, and the multiple grounds for joint liability specified in

---

[1] E.g., *The Charlie Rose Show: Interview of Apple CEO Tim Cook* at 33 minutes (PBS television broadcast Sept. 12, 2014), http://www.charlierose.com/watch/60444569 ("I don't consider Facebook a competitor. I consider Facebook a partner…we partner with both Facebook and [App Defendant] Twitter. And we have integrated both of them into the operating system. And so we work closely with both of them so that our customers can get access in a different and unique way to their services."). Apple has represented in court that the supposedly "third party" apps are, in fact, Apple products. (FAC ¶ 69 at n.21.) ("Apple's products and services include … iPhone, iPad [and] iPod … iOS [and] third party digital contents and applications …") (quoting Motion for a Protective Order at p. 2, ECF No. 396, Apple iPod iTunes Antitrust Litigation, No. 05-cv-00037-JW (N.D. Cal. Jan. 18, 2011).

the SCAC. Apple's challenges to Plaintiffs' standing and to the merits of the conversion claim mimic several arguments made by the App Defendants. Plaintiffs discuss these in the companion omnibus opposition to the App Defendants' serial (and mostly identical) motions. In addition, Apple is barred from challenging the conversion claim by judicial estoppel arising from a similar claim Apple successfully brought in this Court in Apple, Inc. v. Devine, 10-cv-03563-EJD, Complaint at ¶¶ 152-166, ECF No. 1, (Aug. 13, 2010).

Finally, Apple seeks reconsideration of the Court's rejection of its CDA defense, and attempts to deny Plaintiffs the opportunity to prove that Apple's conduct warrants injunctive relief. The Court should reject these arguments too. For all of these reasons, Apple's motion to dismiss should be denied.

## II. PLAINTIFFS DID NOT CONTRADICT THEIR PRIOR PLEADINGS OR CREATE INCONSISTENCIES BY STREAMLINING THE ALLEGATIONS

To justify re-arguing issues it already lost, Apple asserts that Plaintiffs' allegations are "implausible" because, without changing the nature of their allegations, Plaintiffs omitted some of the evidentiary detail previously alleged. For example, to shorten the document, the current complaint contains a much briefer description of the App Store.[2] Plaintiffs did this *solely* to shorten the document and to make the operative pleading more manageable, not because Plaintiffs claim the App Store is different than previously alleged. None of the cuts alter the core material allegations at issue. Having derided the previous complaint for being an "expansive tome," however, Apple now insists that the complaint is *too* "short." (ECF No. 501 at 1.)

The 79-page SCAC is more than sufficiently detailed – and would still satisfy Rule 8 and the case law interpreting it even if it were shorter. Plaintiffs have no objection to Apple's insistence that the Court consider the more lengthy allegations of the prior Complaints; but it should do so under the proper standard, i.e. while assuming the truth of those allegations.

---

[2] (SCAC ¶¶ 39, 41, 42, 44-51.)



## III. ARGUMENT

### A. PLAINTIFFS HAVE PROPERLY PLED THEIR AFFIRMATIVE MISREPRESENTATION CLAIMS

#### 1. Plaintiffs' Claims Under Tobacco II Do Not Require Identification Of The Specific Representations Each Plaintiff Relied On

Apple says that Plaintiffs "failed" to identify specific commercials or other representations they each saw and relied on. As this Court held, Plaintiffs are not required to do so under Tobacco II. (Order at 26.) Apple pivots from this prior ruling, now insisting that notwithstanding the substantive rule under California law as construed by the Court, Rule 9 requires each plaintiff to plead reliance on a specific representation. Rule 9 requires that claims be pled with particularity–it does not create *sui generis* substantive elements for those underlying claims.

A Rule 12(b)(6) motion tests whether the alleged facts, if proven at trial, would support a judgment in a claimant's favor. It cannot be that Plaintiffs can *win at trial* without proving reliance on any specific representation, but cannot get past a motion to dismiss without alleging that very fact. As this Court noted in Haskins v. Symantec Corp., No. 13–cv–01834–JST, 2014 WL 2450996 (N.D. Cal. June 2, 2014), that reading of Rule 9 would "make little sense," converting Rule 9 from a procedural to a substantive rule. Id. at *5.

Apple cites a few decisions from other district courts stating that Tobacco II does not "relax" the pleading standards under Rule 9. None of those decisions expressly analyzes whether Rule 9 requires the pleading of something not an element of the underlying claim, and in each case cited by Apple the court found that no Tobacco II campaign was alleged. This Court should continue to follow its analysis in Haskins and in this very case, recognizing that individual reliance on a specific advertisement is not required to state a claim under Tobacco II. Haskins, 2014 WL 2450996 at *5; Order at 26-27.

#### 2. Plaintiffs Have Adequately Pled Their Tobacco II Claims

As the Court recognized, Plaintiffs' misrepresentation claim arises from the central allegation that "Apple. . . engaged in a long-standing, widespread advertising campaign that

created a reputation for safety and reliability." (Order at 26.) The Court went on to instruct the parties on the six "factors" derived from Tobacco II and its progeny that the Court deemed pertinent to its assessment of whether a Tobacco II claim was adequately pled. (Id. at 27-31.) Apple's insistence that Plaintiffs' allegations fail to meet the relevant standard under that law *in the aggregate* by reference to these six factors is based on either a misreading of the SCAC, a misreading of the Court's Order, or both.

The Court's six-factor Tobacco II formulation necessitates a "fact-intensive inquiry." (Order at 28-29.) Apple's motion asks the Court to go beyond evaluating whether each factor is pled, and usurp the traditional role of the fact-finder to weigh and determine mixed questions of law and fact, such as whether a set of advertising and product marketing statements issued over a period of time form a cohesive or consistent theme or amount to a "lengthy" or "extensive" campaign.[3]

*a) Each plaintiff saw or heard the advertising campaign and pled how he or she was exposed to it*

The first and fifth factors required by the Court are related: "A plaintiff must allege that she actually saw or heard the defendant's advertising campaign" and "when and how each named plaintiff was exposed to [that] campaign." (Order at 27, 30.) Plaintiffs have done both. In granular detail, each plaintiff alleges how and when he or she saw, heard, and was exposed to the advertising campaign.[4]

Apple ignores these allegations, contending that Plaintiffs failed to identify a *specific* advertisement on which each relied. Under Tobacco II, the law requires exposure to the

---

[3] The SCAC attached more than 500 pages of evidence containing statements on the privacy and security of iDevices that emanated directly and indirectly from Apple through multiple marketing channels over several years. (SCAC at Exs. A-CC.) These materials form a part of the pleadings and the court record, are presumed true, and must be evaluated in Plaintiffs' favor. Collectively they easily surpass the durational and extensiveness thresholds for an actionable Tobacco II campaign set by Morgan v. AT&T Wireless Services, Inc., 177 Cal. App. 4th 1235 (2009).

[4] (SCAC ¶¶ 144, 150, 156, 163, 170, 176, 182, 187, 193, 199, 205, 212, 218, 225, 232.)



"advertising *campaign*," not to specific advertisements –and Plaintiffs have alleged that; they have also alleged that they relied on that advertising campaign in their respective purchasing decisions.[5] (Id.)

Apple also contends that Plaintiffs did not allege "an advertising campaign communicating that address book data can never be collected and used by third party applications." (ECF No. 501 at 9.) Nothing in the Court's prior order, Tobacco II, or any relevant case law immunizes Apple from the effect of a misleading advertising campaign touting the "safety and reliability" of its product because its statements may not have uniformly specified safety from "address book data. . . collected and used by third party applications." That's like saying the tobacco companies were immunized from their statements about the "safety and health effects" of smoking because their statements did not uniformly specify safety "from tar and chemical additive intake in the development of lung cancer" or specify the effect "from nicotine intake in the development of addiction." A misrepresentation claim "is not defeated merely because there was alternative information available to the consumer-plaintiff." In re Tobacco II, 46 Cal.4th 298, 328 (2009).

Plaintiffs' detailed allegations of "a long-term, widely distributed marketing campaign to convince potential customers that Apple iDevices were safe and secure, and that they protected customers' privacy" (SCAC ¶¶ 61-78 and Exs. A-CC) are cumulative, stated in abundant detail, and include robust "representative sample[s]" called for by the Court's third factor (Order at 29); moreover, they are demonstrably "similar by category," as the Court put it in discussing its fourth factor, and they need not be "identical" (id. at 29, n. 17), as Apple now contends. Accord Morales v. Unilever United States, Inc., No. 2:13–2213 WBS EFB, 2014 WL 1389613, *3, n.3 (E.D. Cal. April 9, 2014) (allowing claim based, in part, on "larger advertising campaign that emphasized the products' 'natural' qualities."). Under the Court's reading of Tobacco II, those allegations suffice to put Apple on notice and state Plaintiffs' claim.

---

5 (SCAC ¶¶ 61-78, 144, 150, 156, 163, 170, 176, 182, 187, 193, 199, 205, 212, 218, 225, 232.)

*b) Each Plaintiff has alleged when he or she purchased the iDevices*

Apple makes no argument about the sixth factor; each Plaintiff has alleged when he or she purchased his or her iDevices.[6]

*c) The campaign was sufficiently lengthy and widespread under the circumstances to make it unrealistic to require each plaintiff to plead the specific representation he or she saw*

The second factor is whether the advertising is "sufficiently lengthy in duration, and widespread in dissemination, that it would be unrealistic to require the plaintiff to plead each misrepresentation she saw and relied upon." (Order at 28.) Plaintiffs expressly and in detail allege that Apple engaged in a long-term, widely distributed marketing campaign across numerous media, both directly and by intentionally generating "earned media" or "buzz marketing," from before the time the iPhone was first announced in 2007 continuing through the present day. (SCAC ¶¶ 61-78.) Apple itself has described its extensive efforts to "build[] and maintain[] a public reputation for providing a service that offers safe, secure software that protects the integrity, performance, and stability of users' mobile devices." (SCAC ¶ 78 (iv).) Apple largely ignores Plaintiffs' allegations by calling them "hyperbole" or by counting the number of examples given as if that constituted every advertisement and statement in the campaign. Apple then makes three arguments that the multi-year, nine-figure advertising and promotional campaign alleged by Plaintiffs is neither lengthy nor widespread enough.

*First*, Apple insists that an advertising campaign from 2007 to 2012 is too short because it is not "decades-long" as in the Tobacco II case. But Tobacco II and its progeny set no bright-line threshold for the campaign duration or the quantity of ads and instead compel a qualitative *and* quantitative approach. Makaeff v. Trump University, LLC, No. 3:10–cv–0940–GPC–WVG, 2014 WL 688164, *13 (S.D. Cal. Feb. 21, 2014) ("While it was not a long-term campaign as in *Tobacco II*, it was much more targeted, concentrated, and efficient than *Tobacco II*. The effect of this campaign was to make it highly likely that each member of the putative class was exposed

---

6 (SCAC ¶¶ 139, 145, 151, 157, 164, 171, 177, 183, 188, 194, 200, 206, 213, 219, 226.)



to the same misrepresentation."); Comm. On Children's Television, Inc. v. Gen. Foods Corp., 35 Cal. 3d 197, 214, 217-19 (1983). Yes, the old-media, pre-internet advertising campaign in Tobacco II lasted for decades. But a decade ago advertisements and product promotions could not be made perpetually and globally available on demand to consumers as they can be now via the internet. There was no such thing as an iPhone or iPad a decade ago. Now, taken together, they are among the most ubiquitous personal computer devices in the world and Apple's messaging on them is relentless. More to the point, Apple's promotion and advertising for them is everywhere. David Carr, The Magic in Apple's Products: The Heart, N.Y. Times, Sept. 14, 2014.

Apple's position would essentially immunize much of the tech industry from Tobacco II claims since most technology products, including computers, mobile phones and these iDevices, have relatively short product lifecycles of a few years or less. For example, in the seven years since the iPhone was first announced, Apple has already released seven versions and customers may be eligible for carrier-subsidized upgrades as frequently as every two years. It is thus not surprising that when faced with a Tobacco II claim concerning mobile phones, the California courts recognized that a campaign lasting "over many months" and comprising of just a handful of press releases and web pages sufficiently states a Tobacco II claim. Morgan v. AT&T Wireless Services, Inc., 177 Cal. App. 4th 1235, 1245-46, 1258 (2009) (AT&T's statements in press releases and website advertisements over the nine months preceding plaintiff's mobile phone purchase constituted an actionable Tobacco II claim); accord Makaeff, 2014 WL 688164 at *13. A "decades-long" campaign is simply not a precondition under Tobacco II.

*Second*, Apple argues that the examples, by themselves, do not show extensive advertising either by number or frequency, and are incomplete. But these are just examples, and they *do* show an extensive advertising campaign. Moreover, Apple is well aware of the full-fledged nature and scope of its advertising campaign, far more so than any individual Plaintiffs could ever be. Apple cannot obtain dismissal of a Tobacco II claim by insisting that Plaintiffs have not alleged each and every aspect of its advertising campaign.

*Third*, Apple disclaims responsibility for any statements that it did not directly publish. That contention, which is in no way supported by the cases Apple cites,[7] would create an inequitable loophole in false advertising law by allowing Apple and similar companies to plant stories to encourage third parties to make false statements for it, and then sit back and insist it is not responsible for what other people say about it. Apple's argument is unsupported in California law, which expressly prohibits not only making false advertising directly, but also causing others to do so. Bus. & Prof. Code § 17500; Whiteley v. Philip Morris, Inc., 117 Cal. App. 4th 635, 680-82 (2004) (confirming that liability results from both direct statements and from indirect statements repeated or passed on to consumers by third parties). Plaintiffs have alleged that Apple is directly responsible for the content of its "buzz marketing" and, indeed, engages in substantial efforts to create it.[8] (SCAC ¶¶ 61-68.)

The fundamental question under Tobacco II is whether the advertising campaign is extensive enough that a plaintiff should not be "required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements." In re Tobacco II, 46 Cal. 4th at 328. Plaintiffs have alleged that here.

*d) Plaintiffs have sufficiently described the campaign and provided examples*

Apple insists that Plaintiffs have not alleged what is false about its advertising. Apple also insists that some components of the advertising, taken alone, are mere puffery and thus not actionable. Finally, Apple attempts to limit the universe of relevant advertising. None of these arguments have merit.

---

7 Yordy v. Plimus, Inc., No. C12–0229 THE, 2012 WL 2196128 (N.D. Cal. June 14, 2012), and In re Jamster Mktg. Litig., No. 05cv0819 JM(CAB), 2009 WL 1456632 (S.D. Cal. May 22, 2009), merely note that UCL and CLRA liability may not be vicarious. Neither case suggests that Apple cannot be liable for deliberately generating misleading buzz about itself as alleged here.

8 See also Mark Gurman, Seeing Through the Illusion: Understanding Apple's Mastery of the Media, 9 to 5 Mac, Aug. 29, 2014; John Martello, How Apple Does Controlled Leaks, The Mac Observer, Jan. 5, 2010.

To be clear: Apple's advertising scheme deliberately creates the impression with consumers that its iDevices are secure and protect the privacy of user data, including address book data.  (SCAC ¶¶ 61-78.)  Those representations are false because, in fact, the iDevice address book lacks security, Apps are able to take that data without permission, Apple teaches App Defendants how to do that, and Apple builds program components that allow them to do so without the permission of the iDevices' owners.[9]

Apple also tries to exclude from the alleged advertising campaign various statements made in license agreements, guidelines, or to (purportedly) limited audiences.  But Apple knows perfectly well the cumulative effect these statements have on the "buzz" or "earned media" generated by and about Apple.  (SCAC ¶¶ 63-69.)  Apple cannot, for example, make statements at an ostensibly labeled (but media credentialed) developers conference that it knows will be picked up by numerous media and repeated (and live-streamed and web-cast on demand by Apple) all over the world, and then insist (1) that the conference was not advertising, and (2) it is not responsible for what third parties reported based on what Apple said at the conference.  A reasonable jury could readily conclude that Apple was aware that these types of non-traditional statements would get widely repeated and thus act as (free and favorable) advertising.

Apple's own statements prove that it makes deliberate efforts to create the allegedly false reputation about its products in the mind of the consuming public.  (SCAC ¶ 78.)  Just as in Tobacco II, where various types of statements by tobacco companies created the false impression that tobacco cigarettes were safe and healthy, the falsity of Apple's *campaign* of advertising must be analyzed as a whole.  Apple cannot pick out parts of its alleged campaign and knock them out by insisting that, standing alone, they do not constitute actionable misrepresentations.[10]

---

[9]      (SCAC ¶¶ 44, 52, 88, 89, 250-51; ECF No. 3 (hereinafter "FAC") ¶¶ 110, 113, 118-20.)

[10]      Even here Apple misstates Plaintiffs' argument.  Plaintiffs do not allege that Apple promised "perfect security" or immunity from hacking–such as the September 2014 hack of private celebrity photos from Apple's iCloud.  Rather, Apple advertised and promoted devices that it represented were secure but which, in fact, allowed and even facilitated the exposure and easy taking of private address book data by third parties.

That will be up to the jury. The only issue here is whether the advertising campaign as a whole, as alleged in the SCAC, is sufficiently described. It is.[11]

*e) Apple's representations consistently misdescribe iDevice privacy features and misrepresent the security of data on iDevices*

Finally, Apple insists that Plaintiffs have not alleged a consistent set of messages because, according to Apple, most of the statements are not specifically related to the precise type of data being stolen. That is neither Plaintiffs' theory nor the law. As set forth in the SCAC, Apple's statements about security and privacy in all aspects of its iDevices constitute precisely the type of widespread and deep-seated misrepresentations about the iDevice's characteristics that, if false, is actionable under Tobacco II. Indeed, the ubiquity and universality of the message that Apple's products are safe, have built-in privacy protections (like sandboxing), and will securely protect and safeguard users' private data makes that false representation all the easier for a reasonable consumer to believe and rely on, and thus all the more damaging.

## B. PLAINTIFFS HAVE PROPERLY PLED THEIR OMISSION CLAIM

### 1. Plaintiffs Sufficiently Allege The Flaw Existed During The Warranty Period

Apple essentially concedes the well-established rule that an omission claim for failing to inform consumers about known defects existing within the warranty period is valid. (ECF No. 396 at 26); Elias v. Hewlett-Packard Co., 950 F. Supp. 2d 1123, 1136 (N.D. Cal. 2013); Apodaca v. Whirlpool Corp., No. SACV 13–00725 JVS (ANx), 2013 WL 6477821 (C.D. Cal. Nov. 8, 2013). Apple argues that Plaintiffs have not alleged that the defect manifested during the initial one-year warranty period. Judge Whyte recently rejected the identical argument by Apple in Donohue v. Apple, Inc., 871 F. Supp. 2d 913, 926-27 (N.D. Cal. 2012) (a case alleging a defect in the iPhone's signal meter). In distinguishing the same authorities Apple cites here, the court

---

[11] Apple's motion is replete with arguments about what the exemplar statements "mean," and reference to other statements Apple believes are inconsistent with the allegations. But Apple does not get to litigate those jury issues on a motion to dismiss.

stated: "By contrast, plaintiff here alleges that his iPhone failed to perform as expected from the moment he purchased it. This case therefore does not raise similar policy concerns regarding potential conflicts between a manufacturer's right to limit its liability under warranty and its duty to disclose known defects." Id.

Plaintiffs' allegations are clear on this point: the address book-related security flaws in the iDevices are built into the iDevices and existed at the very moment the iDevice was sold to a consumer. This is not a latent defect like a poorly welded part that may, or may not, eventually break. The address book database associated with the Contacts App on the iDevice was not sandboxed as represented and was unsecure; and the address book data was consequently rendered open and accessible to all Apps and readily subject to acquisition and theft by the App Defendants at every point in time during the warranty period.[12]

Apple also argues that the Court should interpret Apple's iOS Software Licensing Agreement as disclaiming any warranty about the ability of third party software to steal information from the iDevices simply because Apple does not warrant the operation of the third party software. The validity of these purported warranty disclaimers, and whether they are effective or applicable to any of the individual Plaintiffs, are all questions of fact and go to affirmative defenses, none of which are appropriate for determination on a Rule 12(b)(6) motion.[13] See, e.g., Lima v. Gateway, Inc., 710 F. Supp. 2d 1000, 1006 (C.D. Cal. 2010).

But even assuming, *arguendo*, that the purported disclaimers are valid and applicable, Apple's argument misses the point: the flaw is in the iDevice itself, not in the (purported) third party software's exploitation of that defect. Notably, Apple cites no authority to support its

---

12 (SCAC ¶¶ 41, 54, 82-89, 289, 291, 303, 317; FAC ¶¶ 131, 139.)

13 For example, warranty disclaimers are subject to a reasonableness standard. Cal. Commercial Code § 2316(1) ("Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this division on parol or extrinsic evidence (Section 2202) negation or limitation is inoperative to the extent that such construction is unreasonable.").



argument. Nor can Apple avoid liability for failing to reveal its knowledge about defects in *its own products* by disclaiming any warranty about what third parties could do. The ability of Apps to steal contacts data from Apple's supposedly locked-down and sandboxed devices is a defect in those devices, not just the Apps.

Finally, Apple argues that Plaintiffs do not each specifically allege that the offending Apps stole their address book data during the one year warranty period. That argument ignores the defect at issue: the lack of promised security in the iDevice. (Order at 11 ("Plaintiffs allege that Apple sold them devices that made it possible for third parties to access and copy Plaintiffs' address books without their knowledge.").) That defect is extrinsic to the iDevice, and exists upon purchase, not just when it is actually exploited by an App. Moreover, even if Apple were right, no such specific allegation is required to survive a motion to dismiss. The specific timing of when each Plaintiff's data was non-consensually taken by each App Defendant is a subject within the knowledge of the App Defendants (and perhaps Apple) on which Plaintiffs should have the right of discovery. Even if the Court concluded that Apple's liability for its omissions depended upon the address book data being taken within the first year that would be at most a basis for summary judgment after discovery. Apple cannot simply insist that it will win factual issues and have the case dismissed.

**2. Plaintiffs Sufficiently Pled Active Concealment**

Apple asserts that its Privacy Policy adequately warned consumers that third-party Apps could access their private address book data associated with the Contacts App. Nonsense.

The sole so-called "disclosure" Apple relies on is a few word clause buried within a version of Apple's Privacy Policy dated May 21, 2012[14] that is attached to Apple's motion. (ECF No. 502-7 at 4.) Apple also fails to establish when and how this (or any other) purported privacy policy incorporating any such warning was affirmatively presented to and reviewed by

---

[14] Plaintiffs filed their lawsuit on March 12, 2012, a full two months before the cited Privacy Policy indicates it issued. (ECF No. 1 ("Original Complaint").) Thus, the referenced post-lawsuit Privacy Policy lacks any probative bearing on what, if any, warnings Apple gave the Plaintiffs between the time the bought their devices and when this suit was filed.

consumers, if at all. Moreover, it is clear that a misrepresentation claim is not defeated merely because there was alternative "information available to the consumer-plaintiff." In re Tobacco II, 46 Cal.4th at 328.

The document Apple cites has numerous ambiguities and internal conflicts. One reasonable interpretation of the sentence Apple relies on is that third parties may collect information from the use of their App by the user. In other words, when one uses an App, the App may, with permission, collect information on where the user was as well as the user's own "contact details;" i.e. the user's own email address, telephone number and so on. The rest of Apple's policy repeatedly emphasizes protected user privacy. Nothing in Apple's disclosure suggests, much less explicitly states, that third-party Apps can access and upload information, whether from the location services, the user's own contact information, the address book database or the Contacts App, without the user's consent.

Thus Apple's purported Privacy Policy does not "disclose[] precisely the information that Plaintiffs say was omitted," as Apple contends. If it had, there would have been no scandal when Apps did so, no Congressional hearing, no FTC enforcement action, and no lawsuits against Apple.[15] To the contrary, Apple told consumers that such an invasion of their privacy *could not* happen because, according to Apple, iDevices were configured such that Apps were not supposed to be able to access other data, technically referred to as "sandboxing." (SCAC ¶¶ 76-77.) Apple cannot avoid liability for refusing to disclose the material vulnerabilities in its iDevices by having its lawyers scour lengthy boilerplate disclosures to find some stray words to twist into the meaning they desire. And it certainly cannot do so on a motion to dismiss where inferences go to the plaintiff.

---

[15] (FAC ¶¶ 416, 417 at n. 218, 428 at n. 222.) Indeed, in early September 2014, Apple and its CEO Tim Cook announced and prominently posted across four Apple web sites a detailed privacy manifesto of sorts that they say applies to Apple's customers: http://www.apple.com/privacy/; http://www.apple.com/privacy/privacy-built-in/; http://www.apple.com/privacy/manage-your-privacy/. While this manifesto is an obvious concession by Apple about the steps that are *and always have been* necessary to protect users' privacy and to transparently obtain consent to any upload, it also shows how Apple has failed to take these steps, which has resulted in scandal.

**3. Apple Had, And Still Has, Exclusive Knowledge Of Many Material Facts**

Apple also attempts to contradict Plaintiffs' numerous specific allegations about Apple's superior and exclusive knowledge. (SCAC ¶¶ 79-89.) Plaintiffs do *not* allege that the public already knew what Apple was obligated to disclose. Indeed, although sporadic reports occasionally appeared about breaches in Apple's product security, Apple would routinely drown them out with additional rounds of marketing, press releases and public statements about the privacy and security protections its iDevices offered. Disregarding its errors, Apple would instead pivot to emphasize the exemplary job it claimed it was doing to protect consumers' privacy and the security and sanctity of their mobile data and why consumers should feel comfortable from a privacy and security standpoint with continuing to obtain products and services from Apple. (E.g., ECF No. 502-6.) Moreover, unlike Apple, Plaintiffs had no knowledge that this address book-related flaw was an inherent defect in the iDevices (as opposed to an iterant instance of hacking), much less that Apple was aiding App Defendants and teaching and permitting them to exploit that defect. (SCAC ¶¶ 88-89.) Plaintiffs also allege that Apple has taken affirmative steps to discourage or even disable people's attempts to determine whether their Contacts were being stolen so as to hide the true facts. (SCAC ¶ 87.)

Plaintiffs have thus alleged that Apple had exclusive knowledge of material facts that it failed to disclose. (SCAC ¶¶ 79-89.) Apple's attempt to dispute the truth of those allegations is not a proper argument on a motion to dismiss.

**4. Apple's Partial Disclosures Triggered An Obligation Of Full Disclosure**

Finally, an omission claim can rest on a partial disclosure which triggers a duty of full disclosure. "A failure to disclose a fact can constitute actionable fraud … when the defendant makes partial representations that are misleading because some other material fact has not been disclosed." Collins v. eMachines, Inc., 202 Cal. App. 4th 249, 255-56 (2011); accord Falk v. General Motors Corp., 496 F. Supp. 2d 1088, 1094-95 (N.D. Cal. 2007). This rule applies

regardless of the existence or term of any particular warranty. Lima v. Gateway, 710 F. Supp. 2d at 1006 ("Plaintiff alleges that Gateway made statements about the XHD3000 that were either false or misleading in light of other representations. Such allegations state a CLRA claim. Plaintiff's claim does not rely on any warranty provision. Plaintiff therefore does not need to allege the particular date that his monitor malfunctioned in order to state a valid CLRA claim under the facts of this case.").

Plaintiffs allege that Apple made partial disclosures about its iDevices, as well as limited disclosures about prior data theft, that created a duty of full disclosure.[16] Apple's motion to dismiss ignores this theory, and provides no argument whatsoever in support of dismissing it. Thus, whatever the result on the other omission theories, the Court should deny Apple's motion to dismiss the claim based on partial disclosures.

### C. PLAINTIFFS HAVE PROPERLY PLED THEIR INVASION OF PRIVACY AND CONVERSION CLAIMS AGAINST APPLE

Apple also seeks to dismiss the joint liability claims against it for invasion of privacy and conversion. Apple is as responsible for these claims as the App Defendants as a result of its collaborative efforts to create and distribute the malfeasant Apps, and Apple's attempt to have these claims dismissed without discovery should be rejected by the Court.

#### 1. Plaintiffs' Aiding And Abetting Pleadings Satisfy Rule 8

Allegations of aiding and abetting liability are governed by Rule 8, which merely requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Plaintiffs allege substantial factual detail showing Apple's knowing and purposeful assistance to App Defendants in creating apps, including the harmful portions, and stealing contacts data. As alleged in the SCAC, Apple's iOS Human Interface Guidelines expressly teach and tell App Defendants to take contacts data without seeking permission.[17] Apple is also

---

[16] (SCAC ¶¶ 76-77, 79-86, 289.)

[17] (SCAC ¶¶ 52, 88, 89; FAC ¶¶ 108 at § 3.3.5, 118-20, 127 at § 1.)

KERR
&
WAGSTAFFE
LLP

responsible for creating the harmful APIs that allowed app access to users' address books (SCAC, Ex. 2 (ECF No. 478-26 at 12-13, 29) ("Allow Address book access via filesystem"); FAC ¶ 121) and expressly served as agent for each app on myriad commercial matters. (SCAC ¶ 8 and Ex. J (ECF No. 478-10 at 24-25).) Apple's reach extends deep into every aspect and phase in the life of each app and over the entire consumer iDevice ecosystem. Apple's affirmative and knowing assistance to the App Defendants is described in detail in both Plaintiffs' invasion of privacy and conversion claims.[18] These allegations are sufficient to satisfy Rule 8.[19]

**2. Apple Has Co-Venturer Liability For Each App**

Apple ignores the detailed allegations that it is a joint venturer with each App Defendant.[20] Each App is explicitly described as a joint product and joint endeavor of Apple and each respective App Defendant. (Id.) "A joint venture has been defined in various ways, but most frequently perhaps as an association of two or more persons who combine their property, skill or knowledge to carry out a single business enterprise for profit." Holtz v. United Plumbing and Heating Co., 49 Cal. 2d 501, 506 (1957). Here, Apple and each App Defendant have done that in regard to the apps that they jointly developed, marketed and deployed.

Apple's motion to dismiss provides no discussion whatsoever as to Apple's joint liability for co-developing each of the Apps. Indeed, generally, determination of joint venture status is a fact issue reserved for the jury. Kaljian v. Menezes, 36 Cal. App. 4th 573, 586 (1995) ("The existence or nonexistence of a joint venture is a fact question for resolution by the jury.").

---

18 (SCAC ¶¶ 250-252, 266-267 and Ex. J (ECF No. 478-10 at 24-25); see also FAC ¶¶ 847-56.)

19 Apple's insistence that the term "knowingly and/or recklessly" somehow eliminates all of the other accompanying allegations is baseless. Read as a whole, the allegations of the SCAC plainly show purposeful conduct by Apple–teaching App Defendants to steal contacts data without permission, then assisting them in implementing those lessons. (SCAC ¶¶52, 88, 89.) Indeed, even under Rule 9 a plaintiff is allowed to plead intent, knowledge, "and other conditions of a person's mind" generally. Fed. R. Civ. P. 9(b).

20 (SCAC ¶¶ 2, 8, 19, 28, 30, 33, 90, 91, 93, 99, 101, 104, 106, 110, 114, 118, 122, 126, 130, 134, 249, 250-52, 266-68.)

Accordingly, Plaintiffs' contentions that Apple bears joint liability as a result of its co-development and involvement in each App should be allowed to proceed and the Court should deny Apple's motion to dismiss on the conversion and intrusion claims.

**3. Plaintiffs Have Properly Pled Their Privacy And Conversion Claim**

Apple makes the same substantive arguments concerning the privacy and conversion claims that are made by many of the App Defendants. Rather than repeat their arguments in separate briefs as each defendant did, Plaintiffs' incorporate by reference their consolidated memorandum in response to the App Defendants' motions.

In addition, Apple should not even be allowed to raise the conversion arguments made by the other defendants because Apple itself has successfully sued in this Court for conversion based on non-destructive copying of information. Complaint at ¶¶ 152-166, Apple, Inc. v. Devine, ECF No. 1, 10-cv-03563-EJD, (Aug. 13, 2010).

"Judicial estoppel, sometimes known as the doctrine of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." Rissetto v. Plumbers and Steamfitters Local 343, 94 F.3d 597, 600 (9th Cir. 1996). The purpose is "to protect the integrity of the judicial process by preventing a litigant from "playing fast and loose with the courts." Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990).

There are three non-exclusive factors that courts should consider in determining whether to apply the doctrine of judicial estoppel: (1) A party's later position must be "clearly inconsistent" with its earlier position; (2) whether the party has succeeded in persuading a court to accept an earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled[][;]" (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001) (internal citations omitted). Notably, a judicially estopped party need only have obtained a benefit from a prior position, it need not obtain a final judgment or

express ruling. See Rissetto, 94 F.3d at 605. Further, the doctrine is not limited to the same lawsuit. Id.

Apple cannot successfully sue someone for conversion based on copying data (while not depriving Apple of the data), and then turn around and insist in the same Court that conversion will not lie for copying without a deprivation of use. Based on Apple's affirmative presentation of the same claim that it now insists does not exist (Complaint at ¶¶ 152-166, Apple, Inc. v. Devine, ECF No. 1, 10-cv-03563-EJD (Aug. 13, 2010)), the Court should find Apple estopped from arguing that conversion requires that the owner of property be deprived of its use.[21]

**D. APPLE'S INJUNCTIVE RELIEF ARGUMENT IS BASELESS**

Apple insists that Plaintiffs lack standing to seek injunctive relief against Apple's continued misrepresentations and conduct. At their core, however, Apple's arguments essentially ask the Court to do what is disallowed at this stage: disbelieve the SCAC's allegations.

Once again, Rule 8 does not compel evidentiary pleading. Whether Plaintiffs can ultimately prove facts that support their allegations, which they can, is not a proper subject for a motion to dismiss.

Apple insists that no realistic threat of further misrepresentations or wrongful conduct exists because Plaintiffs have alleged that Apple remedied *some* of the "gaps in its privacy protection." While Apple may have announced its intent to update certain privacy protections, it does not follow that Apple necessarily did so or that Apple's possible correction of some privacy holes means that no misconduct is occurring. Plaintiffs expressly allege that Apple's conduct is ongoing. Apple *still* assists App Defendants to design their Apps, *still* provides APIs for accessing and uploading address books, *still* encourages App Defendants to take Contacts and

---

[21] As discussed in the accompanying brief, Apple was correct in the prior suit, and is wrong here: Copying is sufficient for conversion based on the violation of the property owners' right to control access to and use of the property.

other data without permission through its iOS Human Interface Guidelines, and *still* refuses to acknowledge its prior misstatements and misconduct.

Apple cherry picks language from Bates v. United Parcel Serv., Inc., 511 F.3d 974 (9th Cir. 2007) that "past wrongs do not in themselves amount to [a] real and immediate threat of injury necessary to make out a case or controversy." Id. at 985 (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 103 (1983)). But Apple omits the very next sentence in Bates, also quoting the Supreme Court, "[h]owever, 'past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury.'" Id. (quoting O'Shea v. Littleton, 414 U.S. 488, 496 (1974)). There is no reason to assume that Apple has adequately reformed its misconduct–which it adamantly and unrepentantly denies occurred when it did not do so following earlier incidents. (See ECF No. 502-6.) There is clearly still a substantial likelihood of the same misconduct continuing to occur in the absence of injunctive relief.

Next, Apple claims that Plaintiffs face no threat of repeated injury because they have not alleged that they intend to buy any more iDevices.[22] Whether those precise words are alleged in the SCAC or not is irrelevant. The FAC earlier noted that Apple told Judge Koh during its successful Samsung lawsuit that all mobile device customers are more likely than not to buy additional mobile devices from the same manufacturer, stating:

> A consumer's first purchase of a smartphone exerts substantial influence over subsequent purchases, locking in preference for the first-chosen platform long into the future. . . . [T]here can be fairly significant 'switching costs' when changing from one platform to another. These costs include transferring data, such as contacts, calendars, music files, and media content, to a new device. Smartphone users pay for and download digital apps onto their devices, which typically are easy to transfer among devices running the same platform but cannot be easily transferred to a different platform. . . . Thus, customers who have invested in apps and content for their [ ] device will have a powerful incentive to stick with [that] device[] rather than switch to [a different platform's] device.

---

[22] Apple also implies there is no risk of injury because Plaintiffs are now aware of the true facts. As this Court has held, such an argument would mean injunctive relief was never available in a false advertising case. Rahman v. Mott's LLP, No. CV 13-3482 SI, 2014 WL 325241, *10 (N.D. Cal. Jan. 29, 2014) (citing cases).



(FAC ¶ 71; see also Order Granting Preliminary Injunction at p. 70, ECF No. 221, Apple, Inc. v. Samsung Electronics Co., Ltd., 12-cv-00630-LHK (N.D. Cal. July 1, 2012) (granting Apple's preliminary injunction request and noting that "Apple contends that 'mobile device customers['] … initial choice of a smartphone and associated operating system platform … will likely dictate their future purchases as well … [and that] 'platform stickiness' means that the initial capture of market share is likely to lead to high rates of market share retention").)[23] Here too, Apple is judicially estopped from switching positions and now suggesting that these consumers are unlikely to purchase additional iDevices from Apple. New Hampshire, 532 U.S. at 749-755 (explaining that the doctrine of judicial estoppel operates to prevent litigants from "playing fast and loose with the courts" by switching positions due to the exigencies of the moment) (internal citations omitted).

Plaintiffs clearly allege that many of them are long-time Apple consumers who have purchased numerous iDevices over the years.[24] The current Complaint also alleges that half of American households have an Apple product, and that Apple has over 41% of the U.S. smartphone market. (SCAC ¶ 34.) How, then, especially in the face of its statements to Judge Koh, does Apple interpret these allegations as meaning that none of the Plaintiffs will buy another Apple iDevice in the future?

Plaintiffs have alleged claims that, if true, would provide a remedy of injunctive relief. The motion to dismiss that claim for relief should be denied.

---

[23] See also Transcript of Proceedings held on 08-03-12 at 61:2-11, ECF No. 1610 (Testimony of Apple Chief Marketing Officer Phil Schiller), Apple, Inc. v. Samsung Electronics Co., 11-cv-01846-LHK (N.D. Cal. Aug. 7, 2012) ("We know from all of our products and experiences we've had selling to customers that a customer who already has one is used to that one, that whole ecosystem. If I have an iPhone, I'm used to how the iPhone works, and I've invested in the applications, and I've invested in the accessories, so I'm more invested in that product, and I'm more likely to stick with that product line once I have it.").

[24] (SCAC ¶¶ 139, 145, 151, 157-58, 164-65, 171, 177, 183, 188-89, 194, 200, 206-07, 213, 219-20, 226-27.)



### E. APPLE CANNOT RELITIGATE ITS ALREADY-REJECTED CDA DEFENSE BY MISCHARACTERIZING PLAINTIFFS' CLAIMS

The Court has already held that Plaintiffs' non-misrepresentation claims against Apple are not barred by the Communications Decency Act ("CDA") because Apple is not being sued as a mere provider of the App Store. (Order at 18-23.) The material allegations the Court relied on for that conclusion remain in the current complaint. Apple is just nakedly seeking reconsideration of the Court's prior order. Apple cites no new law or other circumstances that would justify such reconsideration. Apple's arguments are no more valid than they were on last year's motion to dismiss.

#### 1. The CDA Provides A Limited Affirmative Defense, Not Blanket Immunity

Congress enacted the CDA following a New York state court decision[25] that held an internet service provider strictly liable for allowing a third party to post a libelous message on one of its message boards. Section 230(c)(1) provides: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The CDA was thus enacted "to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material." Carafano v. Metrosplash, 339 F.3d 1119, 1122 (9th Cir. 2003). The statute was never intended to provide blanket immunity for all acts by interactive computer service providers. See Fair Housing Council of San Fernando Valley v. Roommates.com, 521 F.3d 1157, 1164 (9th Cir. 2010) (hereinafter "Roommates.com") ("The [CDA] was not meant to create a law-less no-man's-land on the Internet.").

Apple repeats its failed argument that section 230 of the CDA "immunizes" its conduct described in the SCAC. (ECF No. 501 at 24.) The Ninth Circuit however, has emphasized that section 230 of the CDA is not a general immunity statute:

---

[25] Stratton Oakmont, Inc. v. Prodigy Services Co., No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995).



> Looking at the text, it appears clear that neither this subsection nor any other declares a general immunity from liability deriving from third-party content, as Yahoo argues it does. "Subsection (c)(1) does not mention 'immunity' or any synonym." *Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 669 (7th Cir. 2008). Our recent *en banc* decision in *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, rested not on broad statements of immunity but rather on a careful exegesis of the statutory language. 521 F.3d 1157, 1171 (9th Cir. 2008) (en banc) (noting that to "provid[e] immunity every time a website uses data initially obtained from third parties would eviscerate [the statute]").

Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1100 (9th Cir. 2009) (emphasis added). Rather, CDA section 230 is an affirmative defense available only to defendants who can establish that they functioned solely as a "publisher" of other's speech or "content" and thus qualify as an "interactive service provider." Id.; see also Doctor's Assocs. Inc. v. QIP Holders, LLP, No. 06-cv-1710, ECF No. 87, slip op. at 4-5 (D. Conn. Apr. 19, 2007) ("invocation of Section 230(c) … constitutes an affirmative defense") (citations omitted); 47 U.S.C. § 230(c). This Apple cannot do, and certainly not on a motion to dismiss.

**2. The Claims Alleged Against Apple Do Not Trigger A CDA Defense**

Apple attempts to repurpose the CDA from the promotion of free speech to the immunization of both the online sale of digital products and of theft. Plaintiffs' claims against Apple are not based on holding Apple responsible for content provided by someone else. They are based on Apple's own content as well as Apple's *conduct* and the conduct of the jointly liable App Defendants. Plaintiffs are not attempting to hold Apple strictly liable for merely "publishing" Apps created by other persons. Rather, Plaintiffs seek to impose liability for Apple's active orchestration of, and participation in, a scheme that causes and enable Apps to steal users' private information.[26]

---

[26] Apple's arguments fallaciously equate creating and selling software that causes harm with simple "speech." Taken to its logical extreme, Apple's view of the CDA would allow online software sellers to avoid all liability for their conduct, while brick-and-mortar sellers engaged in the same conduct remained fully liable. Such a distortion of the concept of "speech", which no court has accepted and which is entirely contrary to Congress' intent in enacting the CDA, would have serious First Amendment and equal protection implications.

The protections in Section 230(c)(1) apply *only* if the "interactive computer service" provider is not also an "information content provider," i.e., one who facilitated or contributed to the distributed content at issue. See also Swift v. Zynga Game Network, Inc., No. C 09-05443 SBA, 2010 WL 4569889, *3 (N.D. Cal. Nov. 3, 2010) (hereinafter "Zynga") (noting that the protections "do[] not apply if the interactive computer service provider is also an 'information content provider' which is defined as someone who is 'responsible, *in whole or in part*, for the creation or development of' the offending content." (emphasis in original)); Roommates.com, 521 F.3d at 1162 (holding that CDA immunity "applies only if the interactive computer service provider is not also an 'information content provider'"); Batzel v. Smith, 333 F.3d 1018, 1033 (9th Cir. 2003); Fraley v. Facebook, Inc., 830 F. Supp. 2d 785, 801-802 (N.D. Cal. 2011) (CDA immunity didn't apply because "[a]lthough Facebook meets the definition of an interactive computer service under the CDA . . ., in the context of Plaintiffs' claims, it also meets the statutory definition of an information content provider."). Stated simply, a defendant cannot wear multiple hats and play multiple roles and still expect to escape liability via the CDA.

Whether Apple's app-related activities land it in one CDA category or the other is precisely the sort of factual dispute that is premature on a motion to dismiss, necessitates discovery and if supported by evidence on summary judgment is reserved for determination by the fact-finder:

> Because "invocation of Section 230(c) immunity constitutes an affirmative defense[, a]s the parties are not required to plead around affirmative defenses, such an affirmative defense is generally not fodder for a Rule 12(b)(6) motion." Novak v. Overture Servs., Inc., 309 F.2d 446, 452 (E.D.N.Y. 2004); see also Doe v. GTE Corp., 347 F.3d 655, 657 (7th Cir. 2003) ("Affirmative defenses do not justify dismissal under Rule 12(b)(6); litigants need not try to plead around defenses."). Thus, "such a defense is generally addressed as Rule 12(c) or Rule 56 motion." Novak, 309 F.2d at 452. Moreover, taking the allegations in the Fourth Amended Complaint as true for purposes of this motion, the court cannot, as a matter of law, state that "the plaintiff can prove no set of facts in support of" a finding of no immunity under the CDA. Conley, 355 U.S. at 45-46. Instead, whether or not Quiznos is an "information content provider" is a question awaiting further discovery.

Doctor's Assocs. Inc., No. 06-cv-1710, at 4-5.

As this Court has already found, Apple is not merely a passive participant in the development and distribution of apps on the iDevices. Rather, as alleged in the SCAC, Apple was a very active, indeed a controlling participant, and, specifically, Apple's iOS Human Interface Guidelines expressly teach App Defendants to take contacts data without permission or notice.[27] The Court has already found that these same allegations fall outside of any CDA protection. (Order at 22-23.) Apple's role as the App Defendants' agent is also inconsistent with CDA protection.

As the Ninth Circuit has held, "the party responsible for putting information online may be subject to liability, even if the information originated with a user." Roommates.com, 521 F.3d at 1165, id. at 1171 ("even if the data are supplied by third parties, a website operator may still contribute to the content's illegality and thus be liable as a developer. Providing immunity every time a website uses data initially obtained by third parties would eviscerate the exception to section 230 for 'develop[ing]' unlawful content 'in whole or in part'"). Apple has done far more than that here and the true depth and scope of Apple's involvement is within Apple's exclusive knowledge. Moreover, the Zynga Court observed:

> In passing Section 230, Congress sought to allow interactive computer services "to perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete." "In other words, Congress sought to immunize the removal of user-generated content, not the creation of content ...." As noted by the Ninth Circuit, '[i]ndeed, the section is titled 'Protection for "good Samaritan" blocking and screening of offensive material "... the substance of section 203(c) can and should be interpreted consistent with its caption."

2010 WL 4569889 at *4 (citing Roommates.com, 521 F.3d at 1163, 1174) (emphasis added).

In Zynga, plaintiff, a player of a "virtual world" game created by the defendant game-developer Zynga, brought a suit for violation of the UCL and CLRA based on allegedly

[27] (SCAC ¶¶ 52, 88, 89.)



fraudulent in-game special offers from third-parties. Id. at *1-3. The plaintiff alleged that Zynga generated its revenue through sale of virtual currency to players. Id. at *1. Among the ways players could earn virtual currency was through third-party special offers. Id. The plaintiff alleged that these special offers (integrated into the game by Zynga and an aggregator[28]) were misleading and resulted in users subscribing to unwanted goods or services. Id.

Although Zynga argued that it was entitled to immunity under the CDA and sought to dismiss plaintiff's complaint, the Court denied its motion as premature because the complaint "alleges facts which, if proven, could support the conclusion that [Zynga] was responsible, in whole or in part, for creating or developing the special offers at issue." Id. at *5.

Apple insists that "promotion" or "encouragement" do not suffice to make it an information content provider. But, as discussed above, Plaintiffs have alleged that Apple is a co-marketer, co-seller, worldwide-agent for, co-venturer in, and co-developer of each App in this suit[29] and is chiefly responsible for the existence of and instructing on the use of the harmful APIs that enable non-alerted App access to users' address books.[30]

Apple also insists that the Court has taken the Homan Interface Guidelines "out of context" and that Plaintiffs' allegations already approved by the Court are not "plausible." Apple is just trying to argue the merits of the case instead of applying the proper standard on a motion to dismiss. Apple cannot obtain dismissal based on its affirmative defense under the CDA by insisting that Plaintiffs' allegations are wrong or taken out of context.

Nor is Apple immune, as it reargues in footnote 19, for failure to warn consumers. Apple's omissions concerning the iDevices do not pertain just to conduct of third parties;

---

[28] According to Zynga, the game-developer partnered with an aggregator, or an intermediary, to create the interfaces through which users could receive the third-party special offers. Id. at *1, *6.

[29] (SCAC ¶¶ 2, 8, 19, 28, 30, 33, 90, 91, 93, 99, 101, 104, 106, 110, 114, 118, 122, 126, 130, 134, 249, 250-52, 266-68 and Ex. J (ECF No. 478-10 at 24-25).)

[30] (SCAC at Ex. Z (ECF No. 478-26 at 12-13); FAC ¶ 121.)

Plaintiffs seek to hold Apple liable for statements that Apple made about the *functionality* of the iDevices themselves as well as misstatements about Apple's review process. (SCAC ¶¶ 61-78.) Thus, with respect to Apple's statements regarding its own product, "even if Apple acts as an 'interactive computer service,' Plaintiff[s] seek[] to hold it liable as the 'information content provider' for the statements at issue." Pirozzi v. Apple, 913 F. Supp. 2d 840, 849 (N.D. Cal. 2012).

Finally, Apple insists that there is no "possible motive" why Apple would tell consumers that their privacy was being protected while at the same time assisting App Defendants in violating that privacy. If only we lived in such a world. Recent history is replete with examples of companies promising to protect consumers while, at the same time, actually doing the opposite.

As alleged in the SCAC, the wide availability of popular Apps is a key component to Apple's commercial success. (SCAC ¶¶ 39, 40.) Access to customers' Contacts provides a substantial boost to an App developer and the App's popularity. (SCAC ¶¶ 59-60.) Apple thus has far more than a merely plausible reason to help Apps get as popular as possible while, at the same time, falsely reassuring consumers that their privacy is protected.

In any event, Apple's specific motive is not an element of Plaintiffs' claims, and there is no requirement that they allege it. Apple's insistence that it did nothing wrong and had no motive to do so is a jury argument.[31]

---

[31] Apple's citation of the dismissal of two conspiracy cases as implausible provides no basis for its arguments here. Chang v. Rockridge Manor Condominium, No. C-07-4005 EMC, 2008 WL 413741 (N.D. Cal. Feb. 13, 2008), was a messy pro se lawsuit about plaintiff's dispute with her HOA Board. "Plaintiffs' complaint asserts in essence that there was a massive conspiracy involving the Homeowners Association, its insurer, the five attorneys retained by Plaintiffs, the University and its employees, and a Superior Court judge to deprive Plaintiffs of their right to a fair trial in the two state court lawsuits (i.e., the lawsuit against Ms. Celaya and the lawsuit against Ms. Ammann, Mr. Blakeley, and the Homeowners Association). Such a far reaching fantastic conspiracy is hardly plausible on its face, but in any event, Plaintiffs fail to allege any specific facts which establishes a plausible claim." Id. at *10. Delalla v. Hanover, Ins., No. 10-858, 2010 WL 3259816 (E.D. Pa. Aug. 17, 2010), similarly involved a client's belief that his lawyer was conspiring against him. Neither of these outlier cases bears any relationship to this



**3. Apple's Prior Public Promises To Protect iDevice Owners From Privacy-Invading Apps Waived Any CDA Defense**

Finally, Apple's reliance on the CDA is barred by Apple's repeated assurances that it protects customer privacy in working with App Defendants and distributing their Apps. As noted above, the CDA provides an affirmative defense, it is not an immunity statute. That defense is subject to waiver.

As the Ninth Circuit has held, one way in which the protections of the CDA are waived is by falsely promising customers protections that go beyond the mere hosting activities protected by the CDA. In Barnes v. Yahoo!, 570 F.3d 1095 (9th Cir. 2009), the Ninth Circuit recognized that misrepresentations, promissory estoppel, and waiver could all eliminate the protection provided by section 230 of the CDA.

> Contract liability here would come not from Yahoo's publishing conduct, but from Yahoo's manifest intention to be legally obligated to do something, which happens to be removal of material from publication. Contract law treats the outwardly manifested intention to create an expectation on the part of another as a legally significant event. That event generates a legal duty distinct from the conduct at hand, be it the conduct of a publisher, of a doctor, or of an overzealous uncle.
>
> Though promissory estoppel lurks on the sometimes blurry boundary between contract and tort, its promissory character distinguishes it from tort. That character drives our analysis here and places promissory estoppel beyond the reach of subsection 230(c)(1).
>
> One might also approach this question from the perspective of waiver. The objective intention to be bound by a promise—which, again, promissory estoppel derives from a promise that induces reasonably foreseeable, detrimental reliance—also signifies the waiver of certain defenses.
>
> Subsection 230(c)(1) creates a baseline rule: no liability for publishing or speaking the content of other information service providers. Insofar as Yahoo made a promise with the constructive intent that it be enforceable, it has implicitly agreed to an alteration in such baseline.
>
> Therefore, we conclude that, insofar as Barnes alleges a breach of

---

one or justifies reconsideration of the Court's prior conclusion that the CDA does not immunize Apple's conduct in this case.

> contract claim under the theory of promissory estoppel, subsection 230(c)(1) of the Act does not preclude her cause of action.

Id. at 1107-09.

The same situation is present here. As discussed in detail above, Apple insists to its customers and prospective customers via numerous means that it is doing everything it can to protect their privacy and the security of their iDevices and ensure that Apps it delivers to them are safe, secure, function properly, enhance the customer experience, and don't contain malware or malicious or privacy-invading components that, in the words of Steve Jobs, will "suck up" your data into the cloud.[32] These promises all estop Apple from now insisting it has no obligation to do anything and is immune from liability under the CDA.

**IV. CONCLUSION**

Plaintiffs' complaint against Apple provides far more detail than is required under Rule 8 and, where applicable, Rule 9 and, if proven, clearly state valid claims against Apple. Apple's attempt to rebut the merits of those claims by calling them "implausible," and by rehashing arguments the Court has already rejected, should be rebuffed by the Court, and Apple's motion denied. To the extent, however, that any portion of Apple's motion is granted, Plaintiffs request leave to amend to cure any pleading defect.

Dated: October 10, 2014

*By /s/ Michael von Loewenfeldt*
James M. Wagstaffe
Michael J. Von Loewenfeldt
Michael K. Ng
KERR & WAGSTAFFE LLP
101 Mission Street, 18th Floor
San Francisco, CA 94105
Tel: 415-371-8500
Fax: 415-371-0500

*By /s/ David M. Given*
David M. Given
Nicholas A. Carlin
PHILLIPS, ERLEWINE & GIVEN LLP
50 California Street, 32nd Floor
San Francisco, CA 94111
Tel: 415-398-0900

32 (SCAC ¶¶ 70-71, 76-78, 85-87 and Exs. A- CC.)

Fax: 415-398-0911

*Interim Co-Lead Counsel for Plaintiffs*

Carl F. Schwenker (TBN 00788374,)
LAW OFFICES OF CARL F. SCHWENKER
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
Tel: 512.480.8427
Fax: 512.857.1294

*Plaintiffs' Liaison Counsel*

Jeff Edwards (TBN 24014406; *pro hac vice*)
EDWARDS LAW
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
Telephone: 512.623.7727
Facsimile: 512.623.7729

Jennifer Sarnelli
James S. Notis
Gardy & Notis LLP
560 Sylvan Avenue
Englewood Cliffs, NJ 07632
Tel: (201) 567-7377
Fax: (201) 567-7337

*Plaintiffs' Steering Committee ("PSC")*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 10, 2014, I electronically submitted the foregoing OPPOSITION TO DEFENDANT APPLE, INC.'S MOTION TO DISMISS SECOND CONSOLIDATED AMENDED COMPLAINT using the electronic case files system of the court. The electronic case files system sent a "Notice of Electronic Filing" to individuals who have consented in writing to accept this Notice as service of this document by electronic means.

/s/*Michael von Loewenfeldt*