DURIE TANGRI LLP
MICHAEL H. PAGE (SBN 154913)
mpage@durietangri.com
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:    415-362-6666
Facsimile:    415-236-6300

Attorneys for Defendants
YELP INC. and FOODSPOTTING, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARC OPPERMAN, RACHELLE KING, CLAIRE MOSES, GENTRY HOFFMAN, STEVE DEAN, ALICIA MEDLOCK, ALAN BEUESHASEN, SCOTT MEDLOCK, GREG VARNER, JUDY LONG, GUILI BIONDI, JASON GREEN and NIRALI MANDAYWALA, for themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>PATH, INC., TWITTER, INC., APPLE, INC., FACEBOOK, INC., BELUGA, INC., YELP! INC., BURBN, INC., INSTAGRAM, INC., FOURSQUARE LABS, INC., GOWALLA INCORPORATED, FOODSPOTTING, INC., HIPSTER, INC., LINKEDIN CORPORATION, ROVIO MOBILE OY, ZEPTOLAB UK LIMITED AKA ZEPTOLAB, CHILLINGO LTD., ELECTRONIC ARTS INC., and KIK INTERACTIVE, INC.,<br><br>                    Defendants. | Case No. 3:13-cv-00453-JST<br><br>**REPLY IN SUPPORT OF DEFENDANTS YELP INC. AND FOODSPOTTING, INC.'S MOTION TO DISMISS PLAINTIFFS' SECOND CONSOLIDATED AMENDED COMPLAINT**<br><br>Date:    December 2, 2014<br>Time:    2:00 p.m.<br>Ctrm:    9, 19th Floor<br>Judge:   Honorable Jon S. Tigar |

## I.      INTRODUCTION

Foodspotting and Yelp, in our opening brief, argued that "it is now time to stop dealing with 'Defendants' *en masse*, and address the remaining claims—or lack of them—against each party individually."  Accordingly, Yelp and Foodspotting filed their own brief, detailing the allegations *in Plaintiffs' own Complaint* that establish each Plaintiff's consent for Yelp and Foodspotting to *access* the content of their address books.  The *only* act by either Yelp or Foodspotting alleged to exceed Plaintiffs' consent is the brief copying of email addresses to their servers, but this act is inherent in the "friend finder" functions Plaintiffs requested, and—dispositively for this motion—such a copying claim is in any event squarely preempted by the Copyright Act.  Plaintiffs' claims against Yelp and Foodspotting thus fail.

In response, Plaintiffs again insist on conflating all "Defendants" together, simply ignoring the individualized arguments asserted by each Defendant, and filing a single Opposition arguing that their address books were "*taken* and used by the App Defendants" generically and that "Plaintiffs did not consent to the *uploading and taking* of their address books."  Opp. at 6 (emphasis added).  Again, this misses the point.  There may or may not be App Defendants who accessed address books without first asking (Plaintiffs allege there are), but Yelp and Foodspotting are not among them.  And we do not argue as a pleading matter that Plaintiffs consented to either Yelp's or Foodspotting's "uploading and taking" addresses from those address books (although as a factual matter that is the only feasible meaning of "accessing").  Plaintiffs plead that they consented to "access," and any allegation of any further act by either Yelp or Foodspotting is limited to a pure act of copying, squarely preempted by the Copyright Act.

In an effort to limit the mass of briefing on this motion, the App Defendants have tried to distribute amongst us the issues raised in Plaintiffs' Opposition.  Rather than repeat them, Yelp and Foodspotting join in our codefendants' replies to Plaintiffs' arguments concerning intrusion upon seclusion/invasion of privacy (Twitter's Reply) and conversion of intangible intellectual property (Electronic Arts/Chillingo Reply).  Separately, we address herein the specific consent to Yelp's and Foodspotting's "friend finder" functions, copyright preemption, and Plaintiffs' failure to identify any property interest—tangible or intangible—in anything they claim was converted.

## II.     PLAINTIFFS PLEAD CONSENT TO ACCESS THEIR ADDRESS BOOKS

Our opening brief set forth, verbatim, Plaintiffs' own version of their consent to access to their address books.  Motion at 1-2.  In both cases, Plaintiffs forthrightly admit their consent to using their address books to "find friends" or "Follow People."  Plaintiffs' only complaint, in each instance, is that they do *not* believe that consent extended to transmitting the necessary data to Yelp's and Foodspotting's servers, where they could be matched with other users.  As to Yelp:

> Plaintiffs do not recall being presented at any time in that process with an intervening alert or pop-up display indicating that the Yelp! App would transfer any portion of his or her private address book to Yelp to perform this function or warning that such a transmission was about to occur.

SCAC ¶ 120.  And as to Foodspotting:

> The screen contained no warnings whatsoever indicating that the App was relaying his or her address book to Foodspotting.

*Id.* ¶ 128.

But that sole allegation of an act to which they claim not to have consented—copying the data to each company's servers—is preempted, as discussed below.

In opposition, Plaintiffs do not address their express pleading of consent at all.  Instead, they resort to mockery, describing our position as a "radical and arrogant argument" and asserting that it is not possible to consent to a process without understanding all of its inner workings:  "Uninformed consent is an oxymoron."  Opp. at 6.

Nonsense.  I can consent to my car repair shop performing an oil change, without knowing which mechanic will perform it, where, or with what tools.  I can consent to an online merchant charging my credit card, with no idea which institutions it will communicate with to check my credit or charge my card.  I can consent to delivery of my order by overnight service, without knowing whether the shipper will use FedEx or UPS, or the route, or who will handle it—regardless of the sensitivity of the contents.  I can consent to a background check when applying for a job, with no knowledge of who will conduct it or whom they will contact.  And I can consent to allowing Yelp or Foodspotting to match me up with my friends without understanding that data must be moved in order to be processed.

## III.   PLAINTIFFS' CLAIMS ARE PREEMPTED BY COPYRIGHT LAW

### A.   Plaintiffs misstate and misunderstand copyright preemption

Plaintiffs' position on copyright preemption rests on a fundamental misunderstanding of that doctrine:  Plaintiffs believe that copyright preemption applies *only* where the work at issue is itself copyrightable.  As Congress, the statute itself, and literally scores of opinions make clear, copyright preemption is much broader than that.  Copyright law serves two purposes:  to protect and reward the efforts of authors of copyrighted works, and to define the metes and bounds of the public domain, establishing what works are *not* copyrightable.  Copyright preemption protects both these purposes, preempting *both* state laws that create additional causes of action that overlap federal copyright protection *and* state laws that impinge on the use of material that federal law has determined is *not* copyrightable.  As one leading commentator explains:

> The Supreme Court has held that preemption "is compelled whether Congress's command is explicitly stated in the statute's language or implicitly contained in its structure and purpose."  At first glance, the express provisions of Section 301 do not appear to address two important preemption questions: (1) May works that fail to meet the general standard of originality (or pictorial, graphic, or sculptural works embodied in useful articles that fail to meet the separability standard) be protected by the states?  (2) May subject matter that Congress cannot for constitutional reasons extend copyright protection to (e.g., ideas, systems, methods of operation) be protected by the states?
>
> One may argue that by excluding from protection unoriginal works and otherwise unprotectible material (ideas, facts), Congress removed itself from the field.  An examination of the Copyright Act's structure and purpose, however, leaves no doubt that Congress intended to occupy the field by precluding the states from extending protection in both these circumstances.

6 William F. Patry, *Patry on Copyright* §18:13 (citations omitted).  As Professor Patry goes on to explain:

> May unoriginal works (those which could be protected but which fail to possess the requisite level of creativity) be protected by the states?  The answer is no.  The legislative history reveals Congress carefully considered the issue in adopting the Copyright Office's recommendation to use, in Section 301(b)(1), the phrase "come within the subject matter of copyright," instead of the phrase "subject to protection."  The latter phase would have permitted states to protect works not subject to federal protection due to the lack of originality; the former phrase (the phrase adopted), deliberately precludes state protection for unoriginal works since those works nevertheless "come within the subject matter of copyright."  Thus, the 1975 and 1976 Judiciary Committee reports state "[a]s long as a work fits within one of the general subject matter categories of sections

102 and 103, the bill prevents the States from protecting it even if it fails to achieve Federal statutory copyright because it is too minimal or lacking in originality, or because it has fallen into the public domain."  Case law has followed Congress's instructions by finding that unoriginal works fall within the preempted subject matter prong of Section 301.  Protection might be unavailable not only because of lack of originality, but also because of failure to meet the separability test for pictorial, graphic, and sculptural works embodied in useful articles;[ ] noncompliance with requisite formalities such as affixation of the required copyright notice for works published before March 1, 1989; failure to renew; or lack of national eligibility.

*Id.* § 18.14 (citations omitted).

Plaintiffs mangle this standard beyond recognition.  They cite *Kodatek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998), for the proposition that "the copied materials must be copyrightable subject matter under the Copyright Act."  Opp. at 20.  But *Kodatek* says nothing of the sort.  Rather, it correctly states the statutory standard that, for preemption, the rights at issue must be "'rights that are equivalent' to those protected by the Copyright Act," *Kodatek*, 152 F.3d at 1212, and then finds (1) that the plaintiff's copyright claim was barred for failure to register the drawings at issue, and (2) that the plaintiff's state law claims nonetheless were preempted, because they were "based solely on rights equivalent to those protected by the federal copyright laws."  *Id.* at 1213.

Plaintiffs' reliance on *Worth v. Selchow & Righter Co.*, 827 F.2d 569 (9th Cir. 1987), is even less explicable.  *Worth* is not a preemption case at all, and merely reiterates the *Feist* rule that collections of facts generally are not copyrightable, affirming summary judgment on that ground.  And yet Plaintiffs cite *Worth* to this Court as holding that "copying of trivia book facts for trivial pursuit game [is] not preempted by copyright act," Opp. at 21:  An issue neither presented nor discussed anywhere in that opinion.

Cases correctly applying the copyright preemption standard, by contrast, are legion:  in order to survive copyright preemption, it makes no difference whether the underlying work is eligible for copyright, so long as it falls within the general subject matter of copyright (i.e., words, images, or sounds fixed in a tangible medium).  If it does, the state law claim must involve and additional element (such as misappropriation of trade secrets or breach of contract) to survive preemption.  As Judge Patel explained in *Lattie v. Murdach*, 42 U.S.P.Q.2d 1240, 1997 WL 33803, at *3 (N.D. Cal. 1997):

[C]ompilations of facts may be within the subject matter of copyright even though the facts themselves are not copyrightable.  *Feist Publications*, 499

U.S. at 344–45.  Courts have held that the subject matter of copyright includes works that fit within the general subject matter of sections 102 and 103, whether or not the works qualify for actual protection.  *Baltimore Orioles v. Major League Baseball Players*, 805 F.2d 663, 676 (7th Cir. 1986), *cert. denied*, 480 U.S. 941 (1987); *see also Nash v. CBS, Inc.*, 704 F. Supp. 823 (N.D. Ill. 1989) ("[s]tate law claims do not avoid preemption simply because they are based upon the improper use of uncopyrightable material contained in works properly subject to copyright."), *aff'd*, 899 F.2d 1537 (7th Cir. 1990)[.][1]

And as the Second Circuit explained in *Harper & Row Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 200 (2nd Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985), the fact that the expression at issue may constitute uncopyrightable ideas or facts does not remove the work from the subject matter of copyright under § 301, because otherwise "states would be free to expand the perimeters of copyright protection to their own liking, on the theory that preemption would be no bar to state protection of material not meeting federal statutory standards."  *Id*. (quoting H.R. Rep. No 94-1476 at 130 (1976)).  Similarly, the Seventh Circuit in *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1453 (7th Cir. 1996), held that "[o]ne function of § 301(a) is to prevent states from giving special protection to works of authorship that Congress has decided should be in the public domain, which it can accomplish only if 'subject matter of copyright' includes all works of a type covered by sections 102 and 103, even if federal law does not afford protection to them."  *See also Wrench LLC v. Taco Bell Corp.*, 256 F. 3d 446, 455 (6th Cir. 2001) ("We join our sister circuits in holding that the scope of the Copyright Act's subject matter is broader than the scope of the Act's protections.").

Courts routinely find preemption where the work at issue is uncopyrightable for various reasons.  For example, state law claims based on copying of uncopyrightable facts are preempted.  *See*, *e.g.*, *Skinder-Strauss Assocs. v. Mass. Continuing Legal Educ., Inc.*, 914 F. Supp. 665, 681 (D. Mass. 1995) ("Objecting that use of information contained in the Red Book to develop the Blue Book is an unfair trade practice is not qualitatively different from asserting copyright protection in facts.  Such protection would be contrary to the policies announced in *Feist*, and the Court declines to extend [state law] in this manner."); *Innovative Medical Products Inc. v. Felmet*, 472 F. Supp. 2d 678, 683 (M.D.N.C. 2006)

---

[1] In *Lattie*, the Court found that the state law claims at issue each included an additional element that avoided preemption.

(noncopyrightable factual labeling:  "The work in question need not actually be copyrightable to come within the subject matter of the Act."); *National Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841 (2d Cir. 1997) (§ 301 preempts state law misappropriation claims with respect to uncopyrightable as well as copyrightable elements); *Triangle Publications, Inc. v. Sports Eye, Inc.*, 415 F. Supp. 682, 686 (E.D. Pa. 1976) (state regulation of unfair competition is preempted as to matters falling within the broad confines of the copyright clause of the Constitution); *Freiman v. Seel*, No. CIV. A. 96-7282, 1997 WL 305935 (E.D. Pa. May 29, 1997) (misappropriation and unfair competition claims preempted); *see also* 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 1.01[B][1][f][iii] (1999) (citing cases). Similarly, state law claims based on copying of uncopyrightable government publications are preempted. *See, e.g.*, *Information Handling Servs., Inc. v. LRP Pubs., Inc.*, 54 U.S.P.Q.2d 1571, 2000 WL 433998, at *2 (E.D. Penn. 2000) ("The states may not take it upon themselves to expand copyright protection under the rubric of misappropriation and unfair competition in the absence of Congressional action.").

### B.   Plaintiffs plead no "extra element" that would avoid preemption

As set forth in our opening brief, the works at issue here are paradigmatic noncopyrightable factual data that *Feist* and the long line of following cases hold to be within the scope of the Copyright Act and in the public domain:  names, addresses, and phone or email addresses.  The preemption analysis thus turns on the second prong of the test:  whether the acts alleged include an "extra element" that takes them beyond the scope of preemption.  "[I]f the state law claim involves an 'extra element' not shared by the federal law and that element makes the action qualitatively different from a copyright claim, the state law claim will not be preempted." *Lattie*, 1997 WL 33803, at * 4 (citing *Summit Mach. Tool Mfg. v. Victor CNC Systems*, 7 F.3d 1434, 1440 (9th Cir.1993)).  Examples of such extra elements include misappropriation of trade secrets, or improper acquisition of the work at issue (for example, by hacking), or breach of a nondisclosure agreement.

Here, there is no extra element.  Although Plaintiffs (again referring to "Defendants" as a generic mass) claim that Defendants "misused" their contact information, there are no factual allegations that either Yelp of Foodspotting did anything that could constitute that "misuse."  As to those two defendants, there are only two factual claims:  that each "accessed" Plaintiffs' contacts *after* asking for and obtaining permission, and that each then transferred a copy of the email addresses in those contacts to their servers.

1   Even if one accepts the counterfactual proposition that "accessing" and "transmitting" that data are two

2   distinct acts at all, there are no allegations of any other act that could constitute an "extra element" of

3   misuse.  Plaintiffs (Opp. at 3) struggle mightily to describe simple copying with as many synonyms as

4   they can, such as "obtained," "misappropriated," "uploaded," "acquired," "exploited," and "benefitted."

5   But the alleged act described by each of these words is the same—copying, and nothing more.  Plaintiffs

6   concede as much, attempting to deny that they have no factual claims of misuse of data with "as if

7   transmitting it from the iDevice was not a misuse itself."  Opp. at 2.  There are no allegations that either

8   Yelp or Foodspotting did anything else:  no allegation that they used the data for marketing, or sold it to

9   others, or disclosed it to third parties, or even kept it any longer than necessary to perform the requested

10   and authorized "find friends" function.  There is no "extra element" alleged, and thus Plaintiffs' claims

11   are preempted.

12       Plaintiffs' case law in opposition provides them no support on this point.  As discussed below, the

13   claims in *G.S. Rasmussen* and *Lone Ranger* were not preempted *not* because of some extra element, but

14   because they involve pre-1972 audio recordings, which were never subject to federal copyright law at all,

15   but rather state common-law copyright.  *Downing v. Abercrombie & Fitch*, 265 F. 3d 994 (9th Cir. 2001)

16   was a right of publicity case, with the extra element being the use of the plaintiffs' likenesses to sell

17   clothing.  So too was *KNB Enterprises v. Matthews*, 78 Cal. App. 4th 362 (2000).  *AtPac, Inc. v. Aptitude*

18   *Solutions, Inc.*, 787 F. Supp. 2d 1108 (E.D. Cal. 2011) alleged misappropriation of trade secrets, perhaps

19   the single most common "extra element" in preemption cases.  And in *Chesler/Perlmutter Prods., Inc. v.*

20   *Fireworks Entertainment Inc.*, 177 F. Supp. 2d 1050 (C.D. Cal. 2001), the extra elements included claims

21   for breach of both express and implied contracts.  Plaintiffs make no allegation that could bring them

22   under the holdings in any of these cases.

23       Finally, Plaintiffs (Opp. at 24–25) argue that a claim for invasion of privacy is in some

24   circumstances not preempted, relying on right of publicity cases such as *Downing*.  But this argument is

25   purely circular, bringing us back to where we started.  Plaintiffs *consented* to the claimed invasion of

26   their privacy when they consented to access to their address books:  the subsequent transmission of data,

27   even if not within the scope of that consent (and we maintain it was) adds no additional claim for

28   intrusion, and is preempted.

1

## IV.    PLAINTIFFS CONVERSION CLAIMS FAIL

2          As set forth in both our own and our codefendants' motions, Plaintiffs' conversion claim fails for

3   the same reasons this Court dismissed it the first time, and should be dismissed again.  We will not repeat

4   the arguments regarding Plaintiffs' failure to allege they have been deprived of dominion over their

5   contact information, instead joining in our codefendants' reply briefing on that point.  We write

6   separately, however, to note that Plaintiffs have simply ignored Yelp's and Foodspotting's other

7   independent basis for dismissal:  that conversion is a *property* tort, and Plaintiffs have skipped over the

8   first step in stating a conversion claim at all: identifying a property interest in anything they allege was

9   taken from them.

10          As we pointed out in our opening brief, the *information* contained in Plaintiffs' contact lists is not

11   their property at all, and it is only that *information* that Plaintiffs allege was copied.  As discussed above,

12   that claim is preempted by the Copyright Act, but even were it not, no property interest is implicated

13   here.  Plaintiffs no more own the email addresses in their contact lists than they own the phone numbers

14   in a printed phone book:  they may own the book (or the iDevice) itself, but they have no intellectual

15   property interest in the information *contained* in that book or device, and no property right that entitles

16   them to prevent others from copying that information.

17          Plaintiffs do not respond to this argument.  Instead, in responding to the separate argument that

18   nothing has been converted, they rely exclusively (and often inaccurately) on cases that at least involved

19   some form of property right to begin with.  For example, the property right in *G.S. Rasmussen & Assoc.*

20   *Inc. v Kalitta Flying Service, Inc.*, 958 F.2d 896 (9th Cir. 1992), was a government-issued airworthiness

21   license issued to an aircraft manufacturer[2] (not, as Plaintiffs imply, the piece of paper evidencing

22   issuance of that license).  In both *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718

23   (9th Cir. 1984), and *A&M Records v. Heilman*, 75 Cal. App. 3d 554 (1977), the property at issue was

24   pirated pre-1972 recordings, which were the plaintiffs' intellectual property under common-law state

25

26   [2] "Under the applicable FAA regulations, an STC is granted upon the presentation of certain
     documentation, which normally can be obtained only through expensive and time-consuming design,
27   experimentation and testing.  Moreover, an STC is issued to a particular individual and entitles the holder
     to specific privileges.  The STC is transferable and it may be licensed, in accordance with FAA
28   procedures."  *Rasmussen*, 958 F.2d at 901 (citations omitted).

8

REPLY IN SUPPORT OF YELP AND FOODSPOTTING'S MOTION TO DISMISS PLAINTIFFS'
SECOND CONSOLIDATED AMENDED COMPLAINT / CASE NO. 3:13-CV-00453-JST

1    copyright provisions.[3]  *G.S. Gladstone v. Hillel*, 203 Cal. App. 3d 977 (1988), involved the theft of

2    physical molds used to create gold jewelry:  to the extent the plaintiff also claimed conversion and unfair

3    competition based on the subsequent use of those molds to create copies, the court found those claims

4    preempted by copyright law.  The recent *Flo & Eddie Inc. v. Sirius XM Radio Inc.*, No. CV 13-5693 PSG

5    (RZx), 2014 WL 4725382 (C.D. Cal. Sept. 22, 2014), similarly involved works that were unquestionably

6    works of intellectual property under pre-1972 state copyright law:  the issue in that case is whether the

7    right of public performance is among the "bundle of rights" possessed by the owner of that property.  *J &

8    J Sports Productions, Inc. v. Ceballos*, No. 11-CV-05438-LHK, 2012 WL 4009587 (N.D. Cal. Sept. 12,

9    2012), was a default judgment for piracy of a closed-circuit broadcast under the Federal Communications

10   Act and conversion.  The conversion claim was based on the plaintiff's ownership of exclusive

11   distribution rights of the program, a prize fight.  Similarly, *DIRECTV, Inc. v. Pahnke*, 405 F. Supp. 2d

12   1182 (E.D. Cal. 2005), *Don King Productions/Kingvision v. Lovato*, 911 F. Supp. 419 (N.D. Cal. 1995),

13   and *J & J Sports Productions, Inc. v.Hernandez*, No. 12-CV-05773-JST, 2013 WL 2468354 (N.D. Cal.

14   June 6, 2013), all involved pirated close-circuit or cable broadcasts in violation of both federal statutes

15   and the plaintiffs' exclusive distribution rights to the underlying copyrighted content.

16          In short, every case on which Plaintiffs rely starts from an irreducible minimum:  some form of

17   property ownership that has been infringed or impaired.  Here, that minimum is absent:  Plaintiffs'

18   conversion claims do not rest on ownership of any property to begin with, and should again be dismissed.

19   **V.    CONCLUSION**

20          Plaintiffs offer no reasoned argument to rebut the express consent to access their address books,

21   and thus their invasion of privacy claim fails.  Neither do they allege either a property interest in the

22   contents of those address books or any derogation of that property right that would state a cause of action

23   for conversion, so that claim fails as well.  And finally, Plaintiffs entirely misstate the scope of copyright

24   preemption:  regardless whether the contents of their address books are copyrightable (and they are not),

25

26

27   _____
     [3] Note also that, although the appellate court made reference to the trial court's view of conversion, the
     appeal addressed and ruled on only state-law copyright and unfair competition claims.

28

REPLY IN SUPPORT OF YELP AND FOODSPOTTING'S MOTION TO DISMISS PLAINTIFFS'
SECOND CONSOLIDATED AMENDED COMPLAINT / CASE NO. 3:13-CV-00453-JST

1   any state law cause of action based on copying of that content is preempted.  Accordingly, Plaintiffs

2   SCAC against Yelp and Foodspotting should be dismissed with prejudice.

3

4   Dated:  October 29, 2014                   DURIE TANGRI LLP

5

6                                 By:      */s/ Michael H. Page*

7                                      MICHAEL H. PAGE

8                                Attorneys for Defendants

9                                YELP INC. and FOODSPOTTING, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY IN SUPPORT OF YELP AND FOODSPOTTING'S MOTION TO DISMISS PLAINTIFFS'
SECOND CONSOLIDATED AMENDED COMPLAINT / CASE NO. 3:13-CV-00453-JST

1

**CERTIFICATE OF SERVICE**

2      I certify that all counsel of record who has consented to electronic notification is being served on

3  October 29, 2014 with a copy of this document via the Court's CM/ECF system.  I further certify that I

4  mailed the foregoing document and the notice of electronic filing by first-class mail to all non-CM/ECF

5  participants.

6                                              */s/ Michael H. Page*

7                                                Michael H. Page

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY IN SUPPORT OF YELP AND FOODSPOTTING'S MOTION TO DISMISS PLAINTIFFS'
SECOND CONSOLIDATED AMENDED COMPLAINT / CASE NO. 3:13-CV-00453-JST