1
2
3
4 UNITED STATES DISTRICT COURT
5 NORTHERN DISTRICT OF CALIFORNIA
6

| | |
|---|---|
| MARC OPPERMAN, et al., | Case No.  13-cv-00453-JST |
| Plaintiffs, | |
| | **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION RE: PATH APP** |
| v. | |
| PATH, INC., et al., | |
| Defendants. | Re: ECF No. 651 |

This is a putative class action against Apple and other application developers for alleged invasions of privacy through applications on Apple devices.  Before the Court is Plaintiffs' Motion for Class Certification Regarding the Path App.  ECF No. 651.  The Court will grant the motion as to the Intrusion Upload Subclass but deny it as to the Intrusion Class.

## I.    BACKGROUND

### A.    Factual History

This is a putative class action challenging conduct by Apple and various developers of applications for Apple devices ("App Defendants").  See Second Consolidated Amended Complaint ("SCAC"), ECF No. 478.  Plaintiffs allege that, between July 10, 2008 and February 2012, they owned one or more of three Apple products—the iPhone, iPad, and/or iPod touch (collectively "iDevices").  Id. ¶ 2.  They further allege that Apple engaged in a mass marketing campaign in which it "consciously and continuously misrepresented its iDevices as secure, and that the personal information contained on iDevices—including, specifically, address books, could not be taken without their owners' consent."  Id. ¶ 3.

#### 1.    Contacts Data

Each iDevice comes pre-loaded with a "Contacts" mobile software application (or "App"), which iDevice owners may use as an address book to input and store the following information

United States District Court
Northern District of California

about the owner's Contacts:

> (1) first and last name and phonetic spelling of each, (2) nickname, (3) company, job title and department, (4) address(es), (5) phone number(s), (6) e-mail address(es), (7) instant messenger contact, (8) photo, (9) birthday, (10) related people, (11) homepage, (12) notes, (13) ringtone, and (14) text tone.

Id. ¶ 54, 55.  Plaintiffs allege "[t]he address book data reflects the connections, associations, and relationships that are unique to the owner of the iDevice."  Id. ¶ 56.  Further, the information stored in an address book "is highly personal and private," and "is not shared, is not publicly available, is not publicly accessible, and is not ordinarily obtainable by a third party unless the owner physically relinquishes custody of his or her iDevice to another individual."  Id.

Contacts also works with social and communication software developed for iDevices ("Apps").  See ECF No. 651, Kennedy Decl., Ex. W.  These Apps are developed by other companies but available for download through Apple's online App store.  See ECF No. 651, Cooley Decl. ¶ 4; Green Decl. ¶ 4; Carter Decl. ¶ 4.

### 2.    Path's Upload and Use of Contact Information

Defendant Path launched an updated version of its social networking App (Path 2.0) on November 29, 2011.  ECF No. 651, Kennedy Decl., Ex. M at Tr. 49:6–22.  It is not disputed that Defendant Path uploaded users' iDevice Contacts data without notice or consent and sent it to Path's servers.  See id. at Tr. 44:2–5; 50:11–15; Ex. T.  The Path App automatically uploaded users' Contacts data upon logon, i.e., whenever the user activated the app.  Kennedy Decl., Ex. M at Tr. 49:6–14; Ex. G.  This upload of Contacts data occurred "automatically" and "in the background."  Id., Ex. M at Tr. 49:6–14.  Contacts content included names, birthdays, phone numbers, email addresses, and street addresses.  Id., Ex. D-2.  In less than three months, Path collected and stored over 600 million records derived from the Contacts uploads.  Id., Ex. J-2.  Apple's internal review of the Path App confirmed this practice.  Id., Ex. F.

Path uploaded the Contacts information to enhance Path features, including its "FriendRank recommendation service."  Id., Ex. C-2.  Path used this information to inform Path users which of their Contacts were also Path users and to let them know when their Contacts joined Path.  ECF No. 678 at 3; Lu Decl., Ex. 1 Tr. 166:14–166:20.  Plaintiffs further allege Path

2

1    used the collected to data mine and employ social graph mining techniques.  See ECF No. 651,

2    Ex. D-1 at 1–3.

3         Based on the number of users who registered for Path between November 29, 2011 and

4    February 7, 2012, Plaintiffs calculate that over 480,000 users "unwittingly sent their address book

5    data to Path."  ECF No. 651 at 9–10; Ex. C-1 at 18–20.  On February 8, 2012, Apple released Path

6    2.0.6 in its App Store, which included a user opt-in feature that would ask users whether they

7    wanted to upload their Contacts to Path.[1]  ECF No. 678, Lu Decl., Ex. 1 Tr. 103:10–105:13.

8    Thereafter, Path deleted all previously uploaded user Contacts from its database.  Id.  Since Path

9    released version 2.0.6 of its app, 92.1% of Path users have affirmatively given Path permission to

10   access users' Contacts.  Id., Lu Decl., Ex. 4 (Bates No. PATH-HERN000998).

11        Plaintiffs Stephanie Cooley, Jason Green, and Lauren Carter ("the Path Plaintiffs") logged

12   onto the Path App on their iDevices at some point between November 29, 2011 and February 8,

13   2012.  See, e.g., Cooley Decl. ¶ 4, Green Decl. ¶ 4, Carter Decl. ¶ 4.

14        **B.    Procedural History**

15        This action began as separate class actions filed in California and Texas.  The four actions

16   were consolidated here, where Plaintiffs filed their Consolidated Amended Complaint ("CAC"),

17   ECF No. 362, on September 3, 2013.

18        Defendants filed several motions to dismiss the CAC, and on May 14, 2014 the Court

19   granted the motions in part.  ECF No. 471.  The Court dismissed Plaintiffs' false and misleading

20   advertising, consumer legal remedies/misrepresentation, deceit, Unfair Competition Law ("UCL"),

21   and conversion claims, which Plaintiffs asserted again in their SCAC.  Id.  The Court denied the

22   motions to dismiss Plaintiffs' invasion of privacy (intrusion upon seclusion) claim.  Id.

23        Plaintiffs then filed their Second Consolidated Amended Complaint ("SCAC").  ECF No.

24   478.  In the SCAC, Plaintiffs alleged conversion and invasion of privacy (intrusion upon

25   seclusion) claims against all Defendants, and the following claims against only Apple:

26   (1) violation of California's False and Misleading Advertising Law ("FAL"), Business and

27

28   _____

[1] Only Path versions 2.0 through 2.0.5 uploaded users' Contacts data without their consent.

United States District Court
Northern District of California

1    Professions Code § 17500, *et seq.*; (2) violation of California's Consumer Legal Remedies Act

2    ("CLRA"), Civil Code § 1750, *et seq.*; (3) deceit, California Civil Code § 1709, *et seq.*; and (4)

3    violation of California's UCL, Business and Professions Code § 17200, *et seq.* ECF No. 478 ¶¶

4    243–323.  Plaintiffs requested certification of a class; an injunction prohibiting Defendants from

5    continuing the challenged conduct; actual, compensatory, statutory, presumed, punitive, and/or

6    exemplary damages; declaratory relief; restitution; the imposition on Defendants of constructive

7    trusts; and fees, costs, and interest.  Id. at 78–79.

8            Defendants filed several motions to dismiss in August 2014, but Path did not seek to

9    dismiss Plaintiffs' intrusion upon seclusion claim.  See ECF No. 503.  The Court dismissed

10   Plaintiffs' conversion claim and requests for injunctive relief, but denied the motions to dismiss in

11   all other respects.  ECF No. 543.  Relevant to the present motion, Plaintiffs' claims for intrusion

12   upon seclusion against Path and aiding and abetting against Apple remain.  Id.

13           On February 18, 2016, Plaintiffs filed this motion for class certification.  ECF No. 651.

14   Plaintiffs seek to certify the following class and subclass against Path and Apple for Plaintiffs'

15   claim for intrusion upon seclusion against Path and for aiding and abetting against Apple:

16                   **Intrusion Class:** All persons in the [United States] who received
                     from Apple's App Store a copy of version 2.0 through 2.0.5 of the
17                   iOS mobile application entitled Path (the "Invasive Versions").

18                   **Intrusion Upload Subclass:** All members of the Intrusion Class
                     that were Path registrants and activated via their Apple iDevices
19                   (iPhone, iPad, iPod touch) any of the Invasive Versions of the iOS
                     app between November 29, 2011 and February 7, 2012 (the
20                   "Subclass Period").

21   Id. at 8–9.

22           Defendants Path and Apple oppose the motion.  ECF No. 678 (Path's opposition); ECF

23   No. 667-3 (Apple's opposition).  Plaintiffs filed a reply.  ECF No. 709.  Apple filed an objection

24   and a sur-reply.  ECF Nos. 711, 721.  The Court heard oral argument on June 14, 2016.

25   **II.      JURISDICTION**

26           This Court has jurisdiction over this case under the Class Action Fairness Act of 2005

27   because the amount in controversy exceeds $5 million, exclusive of interest and costs, there are

28   100 or more class members, and the parties are minimally diverse.  28 U.S.C. § 1332(d).

III.     **LEGAL STANDARD**

Class certification under Rule 23 is a two-step process.  First, a plaintiff must demonstrate that the numerosity, commonality, typicality, and adequacy requirements of 23(a) are met.

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  "Class certification is proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied."  Wang v. Chinese Daily News, Inc., 709 F.3d 829, 833 (9th Cir. 2013) (quoting Wal-Mart Stores, Inc. v. Dukes, 546 U.S. 338, 351 (2011)).

Second, a plaintiff must also establish that one of the bases for certification in Rule 23(b) is met.  Here, Plaintiffs invoke Rule 23(b)(3), which requires the court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Additionally, "[w]hile it is not an enumerated requirement of Rule 23, courts have recognized that "in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable."  Vietnam Veterans of Am. v. C.I.A., 288 F.R.D. 192, 211 (N.D. Cal. 2012) (quoting DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir. 1970)).

The party seeking class certification bears the burden of demonstrating by a preponderance of the evidence that all four requirements of Rule 23(a) and at least one of the three requirements under Rule 23(b) are met.  See Dukes, 564 U.S. at 350–51.  "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  Amgen Inc. v. Connecticut Retirement Plans and Trust Funds, 133 S.Ct. 1184, 1194–95 (2013).  "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  Id. at 1195.

IV.     **DISCUSSION**

Path and Apple oppose the motion for class certification, arguing that Plaintiffs have not

United States District Court
Northern District of California

5

established predominance or typicality.  See ECF Nos. 667-3, 678.  The Court addresses each of the requirements of Rule 23 and the parties' respective arguments.

### A.  Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "[C]ourts generally find that the numerosity factor is satisfied if the class comprises 40 or more members."  In re Facebook, Inc., PPC Advertising Litig., 282 F.R.D. 446, 452 (N.D. Cal. 2012).

Path's records demonstrate that 480,125 users registered for the Path App during the Subclass Period.  ECF No. 651 at 13; Kennedy Decl., Ex. G.  Registration represents a subset of users who logged on during the Subclass Period.  Neither Path nor Apple dispute Plaintiffs' contentions regarding numerosity.

The Court concludes that the proposed classes satisfy Rule 23(a)'s numerosity requirement.

### B.  Commonality

A Rule 23 class is certifiable only if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "[F]or purposes of Rule 23(a)(2) [e]ven a single [common] question will do."  Dukes, 564 U.S. at 359 (internal quotation marks omitted).  However, the common contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Id. at 350.  "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  Id. (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131–32 (2009)).  The party seeking certification "need only show that there is a common contention capable of classwide resolution—not that there is a common contention that will be answered, on the merits, in favor of the class."  Alcantar v. Hobart Serv., 800 F.3d 1047, 1053 (9th Cir. 2015) (internal quotation omitted).

"The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion

1   [predominance] requirements of Rule 23(b)(3)."  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019

2   (9th Cir. 1998).  Rule 23(a)(2) can be construed permissively.  Id.

3       Plaintiffs argue that commonality is established based on "the uniform intrusion into a

4   private place" and because "the intrusion was highly offensive to the reasonable person."  ECF

5   No. 651 at 13.  Further, common issues of law and fact predominate as "the legal inquiry across

6   the proposed class is the same" and require the same factual proof.  ECF No. 651 at 19.

7       The need to resolve Plaintiffs' allegation that Path committed the tort of intrusion upon

8   seclusion when it uploaded all users' data during the proposed class period without notice or

9   consent is sufficient to establish commonality.  See Dukes, 564 U.S. at 359.[2]

10  **C.    Typicality**

11      In certifying a class, courts must find that "the claims or defenses of the representative

12  parties are typical of the claims or defenses of the class."  Fed R. Civ. P. 23(a)(3).  "The purpose

13  of the typicality requirement is to assure that the interest of the named representative aligns with

14  the interests of the class."  Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992).

15  "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably

16  coextensive with those of absent class members; they need not be substantially identical."  Parsons

17  v. Ryan, 754 F.3d 657, 685 (9th Cir. 2014) (quoting Hanlon, 150 F.3d at 1020).  "The test of

18  typicality 'is whether other members have the same or similar injury, whether the action is based

19  on conduct which is not unique to the Named Plaintiffs, and whether other class members have

20  been injured by the same course of conduct.'"  Id. (quoting Hanon, 976 F.2d at 508).

21      Apple makes several arguments that Cooley, Green, and Carter are not typical of the class.

22  First, Apple argues that the named Plaintiffs repeatedly granted other Apps access to their

23  Contacts data, such that Path's taking such access cannot have caused offense or emotional injury.

24  ECF No. 667-3 at 34.  Plaintiffs respond that, unlike the other Apps to which Apple refers, Path

25  obtained Plaintiffs' contact data without their permission, and that it was the taking without

---

[2] Apple claims in passing that "Plaintiffs have not demonstrated commonality," ECF No. 667-3 at 12, but it is clear that Apple's arguments regarding class members' individual issues and uninjured plaintiffs go to the question of predominance, not commonality.  Id. at 12-22.  The Court addresses Apple's arguments in the predominance section of this order.

United States District Court
Northern District of California

permission that caused an injury.  Apple next argues that named plaintiff Green was solicited to act as lead plaintiff and was offered compensation for his time, citing <u>Rodriguez v. W. Publ'g Corp.</u>, 563 F.3d 948, 959 (9th Cir. 2009).  Plaintiffs explain that the only "compensation" to Green was that a new iPhone was purchased for him so that his old one could be forensically imaged pursuant to a court order.  <u>See</u> ECF No. 635 at 2.  A replacement phone and reimbursement for litigation-related travel expenses are totally unlike the incentive payments criticized in <u>Rodriguez</u>.

Finally, Apple points to Plaintiffs' conduct in upgrading or using their phones to claim that Plaintiffs "spoliated" evidence such that Plaintiffs' ability to represent the case has been compromised.  Given the ubiquitousness of phone upgrades, Plaintiffs' conduct is hardly unique to them.  Rather than making named Plaintiffs unique, their conduct in upgrading to a new device such that the old one is no longer available is likely to be common to the class.  "On average, Americans keep their smartphones for about two years before jumping to a new one."  Farhad Manjoo, "A Wild Idea:  Making Our Smartphones Last Longer," N.Y. Times (on-line ed. Mar. 12, 2014), http://www.nytimes.com/2014/03/13/technology/personaltech/the-radical-concept-of-longevity-in-a-smartphone.html.  A class member who still has her old phone will be the exception, not the rule.  And the same can be said of data deletion that occurs with ordinary use – there are likely to be very few "typical" class members if that means those who have not used their phones since registering with Path.  These claims do not render the named Plaintiffs atypical.

Where a named plaintiff is subject to unique defenses, she may not be typical of the class. <u>Hanon v. Dataproducts Corp.</u>, 976 F.2d 497, 508 (9th Cir.1992).  Defenses unique to a class representative counsel against class certification, however, only where they "threaten to become the focus of the litigation."  <u>Id.</u>  (internal quotation marks and citation omitted).  Even assuming the merits of Defendants' proposed defenses, none of them meets this standard.  Plaintiffs Cooley, Green, and Carter allege claims identical to putative class members.  The Court concludes Plaintiffs have demonstrated typicality.

**D.    Adequacy**

"The adequacy of representation requirement . . . requires that two questions be addressed: (a) do the Named Plaintiffs and their counsel have any conflicts of interest with other class

1   members and (b) will the Named Plaintiffs and their counsel prosecute the action vigorously on

2   behalf of the class?"  In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 462 (9th Cir. 2000).  The

3   requirement "'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a)."

4   Amchem Prods. v. Windsor, 521 U.S. 591, 626 n.20 (1997) (quoting Gen. Tel. Co. of Sw. v.

5   Falcon, 457 U.S. 147, 158 n.13 (1982)).  Among other functions, the requirement serves as a way

6   to determine whether "the Named Plaintiff's claim and the class claims are so interrelated that the

7   interests of the class members will be fairly and adequately protected in their absence."  Falcon,

8   457 U.S. at 158 n.13.

9        The Court finds that Plaintiffs have satisfied both prongs of Rule 23(a)(4)'s adequacy

10   requirement.  Nothing in the record suggests that Plaintiffs have any conflict with class members,

11   nor any reason to believe that either Plaintiffs or their counsel would not prosecute the action

12   vigorously on behalf of the class.  The Court finds Plaintiffs meet the adequacy requirement.

13        **E.    Predominance**

14        A plaintiff seeking certification pursuant to Rule 23(b)(3) must show not only

15   commonality, but also predominance and superiority.  See Hanlon, 150 F.3d at 1022.  Thus, in

16   seeking to certifying a Rule 23(b)(3) class, the plaintiff must show that the common questions in

17   the case "predominate over any questions affecting only individual members" and "that a class

18   action is superior to other available methods for fairly and efficiently adjudicating the

19   controversy."  Fed. R. Civ. P. 23(b)(3).  "When common questions present a significant aspect of

20   the case and they can be resolved for all members of the class in a single adjudication, there is

21   clear justification for handling the dispute on a representative rather than an individual basis."

22   Hanlon, 150 F.3d at 1022 (citing Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal

23   Practice & Procedure § 1778 (2d ed.1986)).  Plaintiffs argue common issues of law and fact

24   predominate because "the legal inquiry across the proposed class in the same" and "the legal

25   elements [of their claims] are susceptible to class-wide proof."  ECF No. 651 at 19.

26        Path and Apple provide five reasons to argue that Plaintiffs do not meet the predominance

27   requirement.  First, choice of law analysis requires the application of the state laws in which each

28   class member resided and used the Path App.  Second, Plaintiffs and putative class members have

United States District Court
Northern District of California

9

varying subjective expectations of privacy in their Contacts data.  Third, specific contents of each phone are relevant to determine liability.  Fourth, Plaintiffs' proposed classes contain uninjured members.  And finally, even assuming that common questions predominate as to liability, damages cannot be feasibly and efficiently be calculated once the common liability questions are adjudicated.

## 1.  Choice of Law

Path and Apple argue that Plaintiffs seek improperly to apply California tort law to a nationwide class of Path App users.  ECF No. 678 at 7; ECF No. 667-3 at 23.  Because the material terms of other states' laws vary significantly, Defendants argue that common issues do not predominate.

To analyze this argument, this Court – a federal court sitting in diversity – must look to the forum state's choice of law rules to determine the controlling substantive law.  Zinser v. Accufix Research Institute, Inc., 253 F.3d 1180, 1187 (9th Cir. 2001).  California law sets forth two different choice of law tests, depending on whether the parties have agreed in advance on a choice-of-law provision:

> California has two different analyses for selecting which law should be applied in an action. When the parties have an agreement that another jurisdiction's law will govern their disputes, the appropriate analysis for the trial court to undertake is set forth in Nedlloyd [Lines B.V. v. Superior Court, 3 Cal. 4th 459 (1992)], which addresses the enforceability of contractual choice-of-law provisions. Alternatively, when there is no advance agreement on applicable law, but the action involves the claims of residents from outside California, the trial court may analyze the governmental interests of the various jurisdictions involved to select the most appropriate law.

Washington Mutual Bank, FA v. Superior Court, 24 Cal. 4th 906, 914–15 (2001).  Here, the Court concludes that California law applies under either test, such that choice of law questions do not defeat predominance.

### a.  Choice of Law Provision

The parties first dispute whether a choice of law clause provision governs Plaintiffs' use of the Path App.  The existence of a choice of law agreement impacts the Court's subsequent choice of law analysis.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Plaintiffs call attention to the choice of law provision in the user agreements Path App

2    users entered into with Path and Apple.  Path's Terms of Use state that the terms of use "will be

3    governed by and construed in accordance with the laws of the State of California, applicable to

4    agreements made and to be entirely performed within the State of California, without resort to its

5    conflict of laws."  See ECF No. 709, Kennedy Decl., Ex. C at 4.  Apple's Terms and Conditions

6    state that "[t]he laws of the State of California, excluding its conflicts of law rules, govern this

7    license and your use of the Licensed Application."  ECF No. 675, Hawk Decl., Ex. 17 at 25 (Bates

8    No. APL-PATH_00011284).  "Licensed Application" refers to Apple's App Store Products.  Id. at

9    22.

10    Despite placing choice of law provisions in their user contracts, Path and Apple now seek

11    to avoid these terms. [3]  Apple argues that Apple's App Store Terms and Conditions do not include

12    a choice of law provision applicable to third-party apps.  See ECF No. 667-3 at 23 n. 12.

13    However, Apple cites to one of the two choice of law provisions in the Terms and Conditions in

14    making that argument.  Id. (citing to Ex. 17 at 12 (Bates No. APL-PATH_00011272)).  As

15    Plaintiffs stress, the second choice of law provision broadly covers the user's use of an App.  ECF

16    No. 709 at 6 n. 2.  Thus, as to the claims against Apple, California law applies.

17    Path argues that its registration process did not require users to agree to its Terms of Use,

18    or otherwise bring such terms of use to the users' attention.  As such, these online terms do not

19    constitute a binding contract between Path and Path's users.  ECF No. 678 at 9.  Path provides a

20    website page, last updated on March 8, 2012, to demonstrate that it did not provide notice of the

21    site's terms to its users.  See ECF No. 678, Lu Decl., Ex. 10.  Generally, "courts enforce

22    inconspicuous browsewrap agreements only when there is evidence that the user has actual or

23    constructive notice of the site's terms."  Tompkins v. 23andMe, Inc., No. 5:13-CV-05682-LHK,

24    2014 WL 2903752, at *6 (N.D. Cal. June 25, 2014).  Plaintiffs do not respond to this argument.

25

26    _____

27    [3] A choice of law provision is enforceable under California law as long as it is not contrary to a
fundamental policy of California, and either (1) the chosen state has a substantial relationship to
the parties or their transaction, or (2) there is any other reasonable basis for the choice of law.

28    Nedlloyd Lines B.V. v. Superior Court, 3 Cal. 4th 459, 466 (1992).  Neither Apple nor Path argues
that its choice of law provision, if it applies, is unenforceable.

1    The Court concludes that Apple's choice of law provision requires the application of

2  California law, but that Plaintiffs have not demonstrated that an equivalent provision applies to

3  Path.[4]

4              **b.  Governmental Interest**

5    Regardless of whether a contractual choice of law provision applies to either Apple or

6  Path, the Court would still apply California law under the three-step governmental interest test.

7    "Under California's choice of law rules, the class action proponent bears the initial burden

8  to show that California has 'significant contact or significant aggregation of contacts' to the claims

9  of each class member." Mazza v. Am. Honda Motor Co., 666 F.3d 581, 589–90 (9th Cir. 2012)

10  (citing Washington Mutual Bank, 24 Cal. 4th at 921)).  This ensures that the application of

11  California law is constitutional.  Id.  "Once the class action proponent makes this showing, the

12  burden shifts to the other side to demonstrate 'that foreign law, rather than California law, should

13  apply to class claims.'"  Id. (quoting Washington Mutual Bank, 24 Cal. 4th at 921).

14    California has a constitutionally sufficient aggregation of contacts to the claims of each

15  putative class member in this case.  Both Path and Apple have their principal place of business

16  here.  ECF No. 551 ¶ 8; ECF No. 558 ¶ 29.  Further, as Path previously explained, its App was

17  "principally researched, designed or developed in Northern California" and "all data held by Path"

18  was managed by Path employees in San Francisco.  ECF No. 124 at 16; ECF No. 131 ¶ 4.  As

19  Apple previously acknowledged, "a substantial part of the events or omissions giving rise" to

20  Plaintiffs' claim occurred in the Northern District of California.  ECF No. 147 at 33. Apple

21  performs its reviews of third-party Apps in Santa Clara County, California.  ECF No. 147-1 ¶ 5.

22    Path and Apple do not dispute these points, but argue that California law cannot apply to

23  the nationwide class because California's interests in enforcing its own law do not outweigh the

24  interests of other states.  The test to determine whether the interests of other states outweigh

25  

_____

26  [4] Plaintiffs contend that Path and Apple should be estopped from disavowing the choice of law provisions in their user agreements because they relied on the same provisions as a basis for

27  arguing that this case should be transferred to California from the Western District of Texas.  ECF No. 709 at 6.  At the argument on this motion, Path convincingly refuted this contention, ECF No.

28  751 at 17, and the record does not support the contention as to Path.  The Court declines further to consider Plaintiffs' estoppel argument because it is unnecessary to resolution of the motion.

United States District Court
Northern District of California

California's interest is as follows:

> First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinate to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied.

Mazza, 666 F.3d at 590.

Path and Apple bear the burden to show that foreign law, rather than California law, should apply. Washington Mutual Bank, 24 Cal. 4th at 921. Path and Apple have not established that other states' interests would be more impaired than California's interests by applying California law to non-Californian class members.

### i.   Differences in Laws of Potentially Affected Jurisdictions

"The fact that two or more states are involved does not itself indicate that there is a conflict of law problem. A problem only arises if differences in state law are material, that is, if they make a difference in this litigation." Mazza, 666 F.3d at 591–52.

Although Path and Apple do not set forth the different elements of an intrusion upon seclusion claim[5] for all 50 states, the Court finds material differences in law between some of the states involved in this litigation. For example, Virginia, the home state of Plaintiff Cooley, does not recognize the common law tort of intrusion upon seclusion. See WJLA-TV v. Levin, 264 Va. 140, 160 n.5 (2002). Similarly, New York does not recognize the privacy tort of intrusion upon seclusion. See Howell v. New York Post Co., 612 N.E. 2d 699, 703 (N.Y. 1993). North Dakota has not yet recognized whether a tort action exists for invasion of privacy. See, e.g., Hougum v.

---

[5] Apple also argues that there are critical differences in the aiding and abetting law of the various states. ECF No. 667-3 at 25–26. Some states require different kinds of scienter, some states limit liability to specific contexts, some states require proof of different elements, and some states do not recognize the tort at all. Id. The Court agrees that Apple has identified material differences in the aiding and abetting law.

United States District Court
Northern District of California

Valley Mem'l Homes, 574 N.W. 2d 812, 816 (N.D. 1998).  Apple points to other differences in the kinds of scienter required and the types of injury which must be suffered.  See ECF No. 667-3 at 25.  These are the kinds of differences that the Mazza court found to be material.  666 F.3d at 591.

Plaintiffs fail to seriously engage these arguments.  They state that "no 'true conflict' exists because . . . foreign states have no true interest in enabling or protecting Apple or Path to secretly harvest data from their residents."  ECF No. 709 at 11.  They also point out that most states recognize a common law claim for intrusion upon seclusion, and 38 of the states (including California) follow the formulation provided by the Restatement (Second) of Torts.  ECF No. 709 at 8 (citing to Meltz, *No Harm, No Foul? "Attempted" Invasion of Privacy and the Tort of Intrusion Upon Seclusion*, 83 FORDHAM L. REV. 3331, 3340–43 (2015)).

Plaintiffs' gloss-over does not obscure the significant differences between the law of the relevant jurisdictions.  The Court concludes that the differences in state law are material, and moves to the Mazza test's second step.

### ii.   Interests of Foreign Jurisdictions

"It is a principle of federalism that each state may make its own reasoned judgment about what conduct is permitted or proscribed within its borders. Every state has an interest in having its law applied to its resident claimants."  Mazza, 666 F.3d at 591–92.  Under step two of the test, the Mazza court concluded that "[e]ach of our states also has an interest in being able to assure individuals and commercial entities operating within its territory that applicable limitations on liability set forth in the jurisdiction's law will be available to those individuals and businesses. These interests are squarely implicated in this case."  Id. at 592–93.

Here, some states do not even recognize the cause of action sought to be certified.  Others have chosen to recognize the tort, but have chosen to establish different requirements for recovery.  "Mazza instructs that these choices are entitled to respect."  Lightbourne v. Printroom Inc., 307 F.R.D. 593, 599 (C.D. Cal. 2015), appeal dismissed (Feb. 10, 2016).  The Court concludes that foreign states have an interest in applying their own laws to Plaintiffs' claims for intrusion upon seclusion and aiding and abetting.

United States District Court
Northern District of California

United States District Court
Northern District of California

### iii.  Impairment of State's Interest

"California's governmental interest test is designed to 'accommodate conflicting state policies, as a problem of allocating domains of law-making power in multi-state contexts . . .'" <u>Id.</u> at 593.  The test is not intended to weigh conflicting state interests by evaluating which law has the "better" or "worthier" social policy, but rather "recognizes the importance of our most basic concepts of federalism, emphasizing 'the appropriate scope of conflicting state policies,' not evaluating their underlying wisdom."  <u>Id.</u> (quoting <u>McCann v. Foster Wheeler LLC</u>, 48 Cal. 4th 68, 97 (2010)).  Under the comparative impairment analysis, the court must "carefully evaluate and compare the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state."  <u>McCann</u>, 48 Cal. 4th at 96–97. [6]

Defendants do not identify or discuss the interests of other jurisdictions except at the greatest level of generality.  For Defendants to meet their burden of showing that foreign states' interests would be impaired, it is not enough for them merely to point to differences between California's law and the laws of other states.  The analysis must be "based on the facts and circumstances of *this* case, and *these* Plaintiffs' allegations."  <u>Forcellati v. Hyland's, Inc.</u>, No. CV 12-1983-GHK MRWX, 2014 WL 1410264, at *2 (C.D. Cal. Apr. 9, 2014) (emphasis in original).  Although they have identified differences in state law, Defendants have not shown how the application of California state law would frustrate the interests of any foreign state.  They have not, for example, undertaken the kind of analysis that led Judge Koh to conclude in the <u>Yahoo</u> case that "for non-California class members, other states' interests would be more impaired by applying California law than would California's interests by applying other states' laws."  <u>In re</u>

---

[6] Generally, "with respect to regulating or affecting conduct within its borders, the place of the wrong has the predominant interest."  <u>Mazza</u>, 666 F.3d at 593.  However, neither party identifies the "place of the wrong."  Some possibilities may include the state where users opened the Path app or the state where Path's data centers housed the Contacts data.  Because the case involves the use of mobile devices, the actual downloading by each class member could have taken place anywhere in the world.  <u>See</u> <u>In re Yahoo Mail Litig.</u>, 308 F.R.D. 577, 603-04 (N.D. Cal. 2015) ("[T]he 'place of the wrong' is less clear in the instant case than it was in <u>Mazza</u>.  As Plaintiffs note, the actual interception and scanning of emails occurs in data centers located throughout the country and the physical location of the sender or receiver does not necessarily determine whether an email will be intercepted in one state or another.").

1   Yahoo Mail Litig., 308 F.R.D. 577, 605-04 (N.D. Cal. 2015) 308 F.R.D. at 605.  The Court

2   therefore cannot conclude that the interests of other states would be impaired by the application of

3   California law.

4        Path and Apple bear the burden of demonstrating "that foreign law, rather than California

5   law, should apply to class claims," Washington Mutual Bank, 24 Cal. 4th at 921, but have failed to

6   satisfy their burden.  Accordingly, the Court applies California law to Plaintiffs' proposed

7   nationwide class.  See, e.g., Forcellati, 2014 WL 1410264 at *4 (applying California false

8   advertising law to a nationwide class because defendants did not meet their burden under

9   California's government interest test).

10                    **2.        Subjective Expectations of Privacy**

11       Path next argues that Plaintiffs cannot satisfy the predominance requirement because

12  several states expressly require that plaintiffs have an actual, subjective expectation of seclusion,

13  which means that an individual inquiry will be required into the subjective expectations of each

14  class member.  ECF No. 678 at 23.

15       As Path points out, however, California law does not require Plaintiffs to prove subjective

16  expectation.  Instead, under California law, the common law tort of "intrusion upon seclusion"

17  requires: "(1) intrusion into a private place, conversation or matter, (2) in a manner highly

18  offensive to a *reasonable person*."  Shulman v. Grp. W Prods., Inc., 18 Cal. 4th 200, 231 (1998)

19  (emphasis added), as modified on denial of reh'g (July 29, 1998).  These elements can be proven

20  on a common basis.

21       As to the first element of the common law claim, "intrusion into a private place" requires

22  the court to ask "whether defendants intentionally intrude[d], physically or otherwise, upon the

23  solitude or seclusion of another."  Shulman, 18 Cal. 4th at 231.  "[T]he defendant must have

24  'penetrated some zone of physical or sensory privacy . . . or obtained unwanted access to data' by

25  electronic or other covert means, in violation of the law or social norms."  Hernandez v. Hillsides,

26  Inc., 47 Cal. 4th 272, 286 (2009) (quoting Shulman, 18 Cal. 4th at 232)).  Plaintiffs argue that the

27  private place was the iDevice, and that Path and Apple's conduct "was the same for all class

28

United States District Court
Northern District of California

16

members, creating a common question for resolution on a classwide basis."  ECF No. 709 at 14.[7]

Although Plaintiffs must conduct themselves "in a manner consistent with an actual expectation of

privacy," Shulman, 18 Cal. 4th at 231, Plaintiffs and the putative class allege they have acted in

such a manner.  They allege they did not provide "voluntary consent to the invasive actions of

defendant[s]."  Id.

The second element asks whether Defendants' conduct was "highly offensive to a

reasonable person."  This element is essentially "a 'policy' determination as to whether the alleged

intrusion is 'highly offensive' under the particular circumstances.  Relevant factors include the

degree and setting of the intrusion, and the intruder's motives and objectives."  Hernandez, 47 Cal.

4th at 287 (internal citations omitted).  These determinations may require an examination of Path

or Apple's motives, but they will not require individualized determinations of class members'

subjective expectations.  Thus, contrary to Defendants' arguments, the inquiry will be classwide,

not individualized.

### 3.     Phone Contents and Sharing

Apple and Path additionally argue that Plaintiffs cannot maintain this action because much

of the Contacts data at issue is publicly available and freely shared.  As Apple argues, "courts

make their decisions regarding whether a plaintiff has stated a legally protectable privacy interest

based on the nature of the information at issue."  ECF No. 667-3 at 15 (quoting In re Yahoo Mail

Litig., 7 F. Supp. 3d 1016, 1040–41 (N.D. Cal. 2014)).  Apple argues that it is not enough for

Plaintiffs to broadly assert their data was taken from them without providing evidence of what was

taken from particular class members.  Id.  Path adds that some information may not be private at

all, particularly if the information comes from public sources.  ECF No. 678 at 18.  This argument

is not persuasive.

First, Plaintiffs do not bring an invasion of privacy claim under the California Constitution,

---

[7] Apple cites to Medical Lab. Mgmt. Consultants v. Am. Broad. Companies, Inc., 306 F.3d 806
(9th Cir. 2002), to contend that Plaintiffs must demonstrate an actual, subjective expectation of
seclusion.  Medical Lab. Mgmt. Consultants, however, was decided based on Arizona law.  Id. at
815.

United States District Court
Northern District of California

United States District Court
Northern District of California

which requires a plaintiff to establish a legally protected privacy interest, as the plaintiffs did in Yahoo Mail.  See In re Yahoo Mail Litig., 7 F. Supp. 3d at 1037 ("To establish an invasion of privacy claim, a plaintiff must demonstrate three elements: '(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy.'").

Second, accepting Defendants' argument would require the Court to pick apart the various components of Plaintiffs' address books and analyze them separately.  Plaintiffs' claims are based on the private nature of the collection of information in an address book, not its individual components.  The Court has already found that plaintiffs have a reasonable expectation of privacy in the collection of private information in their iDevice address books.  Opperman v. Path, Inc., 87 F. Supp. 3d 1018, 1059-60 (N.D. Cal. 2014).  The Court supported its finding with a citation to numerous other courts reaching the same conclusion.  Id.  (citing United States v. Zavala, 541 F.3d 562, 577 (5th Cir.2008) ("[C]ell phones contain a wealth of private information, including emails, text messages, call histories, address books, and subscriber numbers.  Zavala had a reasonable expectation of privacy regarding this information."); United States v. Cerna, No. 08–cv–0730–WHA, 2010 WL 5387694, at *6 (N.D.Cal. Dec. 22, 2010) (citing Zavala) ("Luis Herrera had a reasonable expectation of privacy in the contents of the seized phones as his physical possession of the cell phones created a reasonable expectation of privacy in their contents."); United States v. Chan, 830 F.Supp. 531, 534 (N.D.Cal.1993) (criminal defendant had expectation of privacy in contents of pager because "[t] he expectation of privacy in an electronic repository for personal data is therefore analogous to that in a personal address book or other repository for such information")).

#### 4.    Uninjured Class Members

Apple separately argues that the Court should find that Plaintiffs have not established predominance because the proposed classes contain uninjured people.  ECF No. 667-3 at 20. "[N]o class may be certified that contains members lacking Article III standing.  Standing requires that (1) the plaintiff suffered an injury in fact, (2) the injury is fairly traceable to the challenged conduct, and (3) the injury is likely to be redressed by a favorable decision."  Mazza, 666 F.3d at

594-95 (citations, alterations, and quotations omitted).

With regard to the Intrusion Class, Apple argues that the class definition is overly broad because it includes members who have not been injured – members who downloaded the Path App but never logged into the App and never had their Contacts uploaded.  Id.  Plaintiffs argue that this point goes to the merits of their claim and the Court should not resolve it at class certification.  ECF No. 709 at 27.

Plaintiffs also cite to Hernandez v. Hillsides, Inc., 47 Cal. 4th 272 (2009) for the proposition that even class members whose contacts were not uploaded may be entitled to damages.  In Hernandez, plaintiffs sued their employer for intrusion on privacy because the employer had installed a video camera that monitored the plaintiffs' work are without the employees' knowledge or consent.  The California Supreme Court found that plaintiffs sufficiently alleged an injury even though the employer had not activated the camera while plaintiffs were working, because numerous co-workers had access to the recording equipment and might have recorded or viewed plaintiffs' images.[8]

Hernandez is inapposite to the present case.  There, the plaintiffs had the potential of suffering an injury to their privacy.  Here, a plaintiff who did not sign in to the Path App could not have had her contacts uploaded, and there was no possibility of injury.

The Court agrees with Apple that the Intrusion Class contains members who have suffered no injury at all.  The Court therefore finds that the Intrusion Class cannot be certified.  See Mazza, 666 F.3d at 594-95.

Apple also argues the Intrusion Upload Subclass may contain many uninjured class

---

[8]
> Plaintiffs presumably would have been caught in the camera's sights if they had returned to work after hours, or if Hitchcock had been mistaken about them having left the office when he activated the system. Additionally, except for the one day in which Hitchcock removed the camera from plaintiffs' office, the means to activate the monitoring and recording functions were available around the clock, for three weeks, to anyone who had access to the storage room. Assuming the storage room was locked, as many as eight to 11 employees had keys under plaintiffs' version of the facts (depending upon the total number of program directors at Hillsides).

Hernandez, 47 Cal. 4th at 293.

United States District Court
Northern District of California

members.  Apple notes that 92% of Path users permitted access to their Contacts after Path changed its features in February 2012.  ECF No. 667-3 at 21.  However, that users later consented and permitted Path access to their Contacts data does not diminish the injury users may have suffered from Path's *unconsented to* prior access to use of that same data.  The Court rejects this challenge to the Intrusion Upload Subclass.

### 5.      Injury and Damages

Rule 23(b)(3)'s predominance requirement also applies to questions of damages. "Plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability."  Pulaski & Middleman, LLC v. Google, Inc., 802 F.3d 979, 987–88 (9th Cir. 2015) (quoting Leyva v. Medline Industries Inc., 716 F.3d 510, 514 (9th Cir. 2013)).  To satisfy this requirement, plaintiffs must show that "damages are capable of measurement on a classwide basis."  Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013).  However, "damage calculations alone cannot defeat certification."  Yokoyama v. Midland Nat. Life Ins. Co., 594 F.3d 1087, 1094 (9th Cir. 2010).  And "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)."  Leyva, 716 F.3d at 514.

At the class certification stage, Plaintiffs must show that damages can "feasibly and efficiently be calculated once the common liability questions are adjudicated."  Leyva, 716 F.3d at 514.  Plaintiffs contend that damages can be shown on a classwide basis.  Plaintiffs propose conducting conjoint analysis surveys[9] to establish a uniform, classwide value for the value of the "inherent privacy interest lost to Path App recipients (the Intrusion Class) and users (the Intrustion Upload Subclass)."  ECF No. 651 at 27.  Alternatively, Plaintiffs contend that unjust enrichment

---

[9]           In conjoint analysis, we determine what value a customer places on a particular feature of a product by measuring the partial value ('partworth' utility) of multiple individual features of the product. For example, we measure the value to the customer of the product offered in several combinations, some of which might contain feature 1 (but perhaps not feature 2), some of which might contain feature 2 (but perhaps not feature 1), and some of which might contain both features 1 and 2.  We can use the data we collect to isolate the value to the customer of one particular feature.

Microsoft Corp. v. Motorola, Inc., 904 F. Supp. 2d 1109, 1120 (W.D. Wash. 2012)

United States District Court
Northern District of California

damages are available for the Intrusion Upload Subclass.  Id.  Plaintiffs argue that Path realized a commercial benefit (venture funding) from Path's data collection and use.  Id.  Plaintiffs also assert that they can claim punitive damages, to be awarded across the putative class.  Id. at 21. Finally, Plaintiffs state that should Path or Apple defeat these theories of damages, Plaintiffs can establish a right to classwide nominal damages.  See ECF No. 651 at 29.

### a.      Inherent Value of Privacy

Plaintiffs argue that a conjoint analysis, which would isolate the value of privacy, is a straightforward way to measure damages.  Both Path and Apple point out that in Plaintiffs' motion, Plaintiffs fail to submit any evidence establishing that damages can be feasibly and efficiently calculated using this method.  See ECF No. 667-3 at 28; ECF No. 678 at 20–21.  Path and Apple stress that Plaintiffs failed to provide any damage models showing how it could plausibly calculate the inherent privacy interests of the class.  The Court agrees that Plaintiff failed to meet their burden showing that damage calculations can feasibly and efficiently be calculated.

On reply, however, Plaintiffs provided the Declaration of Dr. Hank Fishkind to describe how economists measure the value of intangible goods and how an economist could measure the value of privacy.[10]  See ECF No. 709-10, Fishkind Decl.  Dr. Fishkind proposes a survey that gives respondents a hypothetical choice between a social media app that offers privacy protection and one that does not.  Id. ¶ 58.  A respondent would have the choice between an app (1) that will not copy their Contact information without their consent for $X, or (2) that will copy their Contact information without their consent for free. The price, $X, will vary randomly for each respondent, and each respondent will only be offered one price.  Id. ¶ 61.  The survey will also request demographic information.  Id. ¶ 62.  Finally, the survey data will be analyzed using a regression analysis.  Id. ¶ 71.

The chief problem with this analysis is that because consumers do not have identical

---

[10] Apple objects to Dr. Fishkind's declaration, contending that it is not a proper reply declaration because it goes beyond rebutting arguments Apple provided in its opposition.  ECF No. 711 at 3. Apple asks the Court strike the declaration as untimely.  ECF No. 721.  After Apple filed its orginal objection, however, it deposed Dr. Fishkind prior to the hearing on this motion, and filed a sur-reply addressing the Fishkind Declaration.   Because any prejudice to Apple from the late filing was cured, the Court declines to strike Dr. Fishkind's declaration.

United States District Court
Northern District of California

United States District Court
Northern District of California

preferences, each class member will place a very different value on the protection of – or misappropriation of – their contacts.  See ECF No. 709-10 (Fishkind Declaration) at 18.  And while some of those differences may be attributable to "observable characteristics such as age, gender, income, and education," id., some of them will be attributable to "variation across individuals concerning their attitude toward and willingness to protect their privacy," id. at 10.  No damages number arising from this model will apply to all class members, particularly since some of the class members, by this measure, will not have been injured at all – i.e., they would have not have required any premium to allow Path to access their contacts, because they don't attach any value to them.

It may be that the average damages that Dr. Fishkind's model would predict will be very close to the damages actually suffered by every class member, but there is no way of knowing this.  It is equally or more likely that his model would overcompensate some class members, while undercompensating others.

Plaintiffs' expert has a partial solution to this problem:  he wants to send a questionnaire to each class member asking them to provide certain "demographic information," including age, gender, and income level.  ECF No. 721-1 at 79:13-25.  Plaintiffs could then calculate damages based on the values that like groups of survey respondents gave to privacy.  But this solution is far from complete.

For one thing, while it may begin to conform the damages awarded to each class member to the damages actually suffered by that class member, that correspondence would be far from complete, because it would still ignore differences among each category.  Not all men, or all persons between 40 and 65, or within any other category, suffered damages uniformly, but Plaintiff's damages model assumes that they do.  Defendants "[are] entitled to individualized determinations of each [class member]'s eligibility for [damages]."  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 131 S. Ct. 2541, 2546, 180 L. Ed. 2d 374 (2011).  Plaintiffs' model fails to meet this requirement.

For another thing, Plaintiffs have not shown that the damages model is administratively feasible.  They contemplate sending each class member a questionnaire, having them complete it,

1  and having someone read and analyze it to determine the appropriate damage award for each class

2  member.  In the prior studies cited by Dr. Fishkind, however, study subjects were willing to pay

3  only $4.05 to protect their contacts list.  ECF No. 709-10 at 15.  The effort just described would

4  certainly cost more than that.

5       Plaintiffs point out that the Ninth Circuit has recently stated, in more than one opinion, that

6  "damage calculations alone cannot defeat class certification."  Pulaski & Middleman, LLC v.

7  Google, Inc., 802 F.3d 979, 987 (9th Cir. 2015), citing Leyva v. Medline Indus. Inc., 716 F.3d

8  510, 513-14 (9th Cir. 2013).  But Leyva also commanded district courts to ensure that damages

9  can "feasibly and efficiently be calculated once the common liability questions are adjudicated."

10  Leyva, 716 F.3d at 514.  In that case, the "[p]laintiff included deposition testimony of Medline's

11  director of payroll operations, and Medline's Notice of Removal," showing "that Medline's

12  computerized payroll and time-keeping database would enable the court to accurately calculate

13  damages and related penalties for each claim."  716 F.3d at 514.  Plaintiffs here cannot make an

14  equivalent showing.

15       The Court concludes that Plaintiffs have failed to provide any method of feasibly and

16  efficiently calculating damages, and that claims based on the recovery of monetary damages are

17  not suitable for class certification.[11]

18                    **b.  Unjust Enrichment**

19       Plaintiffs next propose that the Court certify the Intrusion Upload Subclass based on unjust

20  enrichment damages.  ECF No. 651 at 20.  Plaintiffs contend that Path received venture funding as

21  a result of Path's unauthorized data collection and use and that a portion of the valuation

22  underlying Path's Series B financing round was attributable to Path's alleged misconduct.

23  However, Plaintiffs offer no evidentiary support for this theory, and no way to calculate the

24  alleged damages even if such support existed.  Additionally, as Path points out, it never sold the

25  Contacts data at issue, and it did not circulate new terms for venture funding until *after* it had

26  deleted all of the Contacts data.  ECF No. 678 at 24–25.

27

28  [11] In light of this conclusion, the Court declines to address Apple's other criticisms of Dr.
Fishkind's damages model.

1   The Court finds that Plaintiffs have not sufficiently alleged classwide damages based on

2   unjust enrichment.

3               **c.   Nominal Damages**

4         Finally, Plaintiffs argue that they are entitled to classwide nominal damages, citing an

5   unpublished Ninth Circuit case where a plaintiff was awarded nominal damages after failing to

6   prove compensatory damages on her invasion of privacy claim.  O'Phelan v. Loy, 497 Fed. Appx.

7   720, 722 (9th Cir. 2012).  Defendants do not dispute that nominal damages are appropriate for

8   such a claim, but echo Judge Koh's statement to the effect that there is no authority suggesting

9   that a class should be certified solely because of the availability of nominal damages.  See Brazil

10  v. Dole Packaged Foods, LLC, No. 12-cv-01831-LHK, 2014 WL 5794873, at *14 (N.D. Cal. Nov.

11  6, 2014) ("[Plaintiff] cites no authority to suggest that a damages class should remain certified

12  solely because nominal damages may be available, even though the class would otherwise be

13  properly decertified.").

14        In fact, although the parties do not discuss these authorities, several district courts in the

15  Ninth Circuit have certified classes involving claims for nominal damages.  Davis v. Abercrombie,

16  No. 11-00144 LEK-BMK, 2014 WL 4956454, at *25 (D. Haw. Sept. 30, 2014) (class members

17  will receive "an award of nominal damages for each established violation"); Dillon v. Clackamas

18  Cty., No. 3:14-CV-00820-ST, 2014 WL 6809772, at *7 (D. Or. Dec. 2, 2014) ("Thus, even if

19  currently incarcerated class members cannot recover damages for mental or emotional injury

20  under the PLRA, they are still entitled to recover a nominal $1.00 damage award as a symbolic

21  vindication of their constitutional right"); Leer v. Washington Educ. Ass'n, 172 F.R.D. 439, 446-

22  47 (W.D. Wash. 1997) ("[T]o the extent the Court permits the first subclass to assert its adequacy-

23  of-notice claim as a class claim, it will do so only to the extent the plaintiffs seek injunctive or

24  declaratory relief, plus nominal damages"); see also Gaudin v. Saxon Mortgage Servs., Inc., 297

25  F.R.D. 417, 425 (N.D. Cal. 2013) (listing as one of the "significant common questions of law and

26  fact" underlying certification "whether the Class may recover some or all of their trial payments,

27  nominal damages, or any other remedies under California law").

28        The problems of proof which attend Plaintiffs' claims for compensatory damages are

United States District Court
Northern District of California

24

absent in regard to their claim for nominal damages.  In fact, it is precisely "where the amount of damages is uncertain" that nominal damages may . . . be awarded." Apple, Inc. v. Samsung Elecs. Co., No. 11-CV-01846-LHK, 2012 WL 2571719, at *28 (N.D. Cal. June 30, 2012) "Nominal damages are awarded 'for the infraction of a legal right, where the extent of loss is not shown, or where the right is one not dependent upon loss or damage.'" Crowley v. Peterson, 206 F. Supp. 2d 1038, 1045 n.4 (C.D. Cal. 2002) (quoting C. McCormick, Damages, § 20 at 85 (1935)); see also Arizona v. ASARCO LLC, 773 F.3d 1050, 1058 (9th Cir. 2014) ("Nominal damages are not intended to compensate a plaintiff for injuries, nor to act as a measure of the severity of a defendant's wrongful conduct.") (quoting Cummings v. Connell, 402 F.3d 936, 945 (9th Cir.2005)).

The Court concludes that Plaintiffs' have shown that the nominal damages claims of Intrusion Upload Subclass can be determined on a classwide basis.

### d. **Punitive Damages**

Plaintiffs lastly argue that the Court can certify a class based on Plaintiffs' claim for punitive damages.  Defendants oppose certification of a class seeking punitive damages on several grounds.

First, both Apple and Path argue that the punitive damages laws of the several states differ such that plaintiffs cannot satisfy the predominance requirement of Rule 23.  ECF No. 667-3 at 31-32; ECF No. 678 at 22-23.  This argument fails because, as explained above, the Court will apply California law to Plaintiffs' claims.

Second, both Defendants argue that the evidence in this case does not support an award of punitive damages because there has not been a showing of the "oppression, fraud, or malice" required under California law.  Cal. Civ. Code § 3294 (requiring oppression, fraud, or malice); ECF No. 667-3 at 31-32; ECF No. 678 at 23 ("Plaintiffs presented no evidence that Path's conduct constituted oppression, fraud, or malice.").  This argument depends on a merits inquiry that is not appropriate at the certification stage.  As the Supreme Court recently cautioned, "[m]erits questions may be considered to the extent—but *only* to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen, 133 S.

United States District Court
Northern District of California

United States District Court
Northern District of California

Ct. at 1194-95 (emphasis added).  The question for the Court's determination is not whether Plaintiffs can demonstrate their entitlement to punitive damages now, but whether such damages "can be proved through evidence common to the class."  Id. at 1195; see also Dukes, 564 U.S. at 352 n.6 (district court has no "authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action") (quoting Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974)).

Third, Defendants argue that punitive damages are not susceptible to classwide adjudication because they must be determined based on the individual harm suffered by each class member.  That is not the law.  "Because the purpose of punitive damages is not to compensate the victim, but to punish and deter the defendant, any claim for such damages hinges, not on facts unique to each class member, but on the defendant's conduct toward the class as a whole." Barefield v. Chevron, U.S.A., Inc., No. C 86-2427 TEH, 1988 WL 188433, at *3 (N.D. Cal. Dec. 6, 1988).  Similarly, in Ellis v. Costco Wholesale Corp., 285 F.R.D. 492 (N.D. Cal. 2012) – on which both sides rely – Judge Chen held that the availability of punitive damages, as opposed to the amount of any award, was best decided on a classwide basis.  Id. at 542-43.

It is true that Judge Chen's order further provided that, if the jury decided that punitive damages could be awarded, the court would conduct a subsequent phase in which "Defendant [would have] the opportunity to present evidence as to the proper amount of punitive damages as well as individualized defenses which could defeat any individual class member's claim to punitive damages."  Id. at 544.  It is doubtful such a procedure will be required in this case because, unlike in Ellis, Defendants made no individualized decisions about individual class members.  Rather, Path's software treated each class member in exactly the same manner.[12]  The

---

[12] Defendants contend that the Path App behaved differently among class members because some class members had more or different Contacts information than others.  While these differences might be relevant to compensatory damages, the Court has already determined such damages are not available on a classwide basis.  This eliminates concerns about the ratio between the actual harms suffered by class members and a punitive damage award.  "Because nominal damages measure neither damage nor severity of conduct, it is not appropriate to examine the ratio of a nominal damages award to a punitive damages award."  ASARCO, 773 F.3d at 1058.

The foregoing does not mean that there are no due process limits on the punitive damages that a trier of fact might award, only that punitive damages ratio considerations are not an impediment to

United States District Court
Northern District of California

1    Court need not decide that question now, however.  It is sufficient to decide that the availability of

2    punitive damages is amenable to classwide resolution, and leave the manner in which the amount

3    will be determined to later case management.

4          **F.      Superiority**

5          A class action must be "superior to other available methods for fairly and efficiently

6    adjudicating the controversy."  Fed. R. Civ. Pro. 23(b)(3).  "The superiority inquiry under Rule

7    23(b)(3) requires determination of whether the objectives of the particular class action procedure

8    will be achieved in the particular case."  Hanlon, 150 F.3d at 1023.  "[C]ertification pursuant to

9    Rule 23(b)(3) . . . is appropriate 'whenever the actual interests of the parties can be served best by

10   settling their differences in a single action.'"  Id. at 1022 (quoting 7A Wright & Miller, Federal

11   Practice & Procedure § 1777 (2d ed. 1986)).  The four factors for the Court's examination are: (1)

12   the interest of each class member in individually controlling the prosecution or defense of separate

13   actions; (2) the extent and nature of any litigation concerning the controversy already commenced

14   by or against the class; (3) the desirability of concentrating the litigation of the claims in the

15   particular forum; and (4) the difficulties likely to be encountered in the management of a class

16   action.  Zinser, 253 F.3d at 1190–92.

17         Here, the modest damages, if any, suffered by each class member make pursuing an

18   individual claim unlikely at best.  As Judge Posner has observed, "[t]he *realistic* alternative to a

19   class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a

20   fanatic sues for $30."  Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004)

21   (emphasis in original).  Class treatment is clearly superior to the alternatives.[13]

22

23

24   _____

     certification.

25   [13] The Plaintiffs must also show that the class is ascertainable.  Ascertainability "is an inherent
     requirement of at least Rule 23(b)(3) class actions."  Lilly v. Jamba Juice Co., 308 F.R.D. 231, 236
26   (N.D. Cal. 2014) (citing William B. Rubenstein, Newberg on Class Actions §§ 3:1–3:3 (5th ed.)).
     "[A] class definition is sufficient if the description of the class is 'definite enough so that it is
27   administratively feasible for the court to ascertain whether an individual is a member.'"  Vietnam
     Veterans of Am., 288 F.R.D. at 211 (quoting O'Connor v. Boeing N. Am., Inc., 184 F.R.D. 311,
28   319 (C.D. Cal. 1998)).  Here, no one contests that Plaintiffs satisfy this requirement.

**CONCLUSION**

The Court now orders as follows:

1.      Plaintiffs' Motion for Class Certification is GRANTED as to the following class on Plaintiffs' claim for invasion of privacy/intrusion on seclusion:

Intrusion Upload Class:[14] All members of the Intrusion Class that were Path registrants and activated via their Apple iDevice (iPhone, iPad, iPod touch) any of the Invasive Versions of the iOS Path app between November 29, 2011 and February 7, 2012.

2.      The Court finds as follows:

        a.      The Intrusion Upload Class is sufficiently numerous;

        b.      The Intrusion Upload Class is ascertainable;

        c.      Questions of law and fact are common to the class that predominate over any individual questions;

        d.      Plaintiffs' claims are typical of the claims of the Intrusion Upload Class and Plaintiffs are appointed as Class Representatives;

        e.      Plaintiffs' Interim Co-Lead Counsel will adequately represent the Class, have no conflicts with the Class, and are appointed as Class Counsel; and

        f.      Class Certification is superior to other means of adjudication.

3.      Plaintiffs' Motion for Class Certification as to the Intrusion Class is DENIED.

In the joint case management statement due on August 2, 2016 by 5:00 p.m., the parties are ordered to propose a schedule for the remainder of the case through trial.  The Court will conduct a Case Management Conference on August 16, 2016 at 9:30 a.m.

IT IS SO ORDERED.

Dated:  July 15, 2016

_____
JON S. TIGAR
United States District Judge

---

[14] In light of the Court's order denying certification of the Intrusion Class, it is no longer necessary to refer to this smaller group as a subclass.